[No. B037777. Second Dist., Div. Two. Sept. 28, 1989.]

HELEN GONZALES, Plaintiff and Appellant, v.
METPATH, INC., Defendant and Respondent.

COUNSEL

Steven Lee Roller for Plaintiff and Appellant

Seyfath, Shaw, Fairweather & Geraldson, Barbara Lindemann Schlei and David D. Kadue for Defendant and Respondent.

OPINION

**ROTH, P. J.**—In an employment discrimination case, Helen Gonzales appeals from the summary judgment entered in favor of respondent MetPath, Inc.

The operative facts are quite straightforward and not in dispute. MetPath operates a clinical laboratory for analysis of medical samples and provides door-to-door delivery service for its physician customers. Gonzales, whose previous employment involved delivering baked goods to bakery customers, applied to MetPath for a job. MetPath hired her in April 1980 as a professional service representative in Los Angeles at an annual salary of $12,000. In January 1982 Gonzales became administrative assistant to the operations manager. In April 1982 Gonzales became sales secretary. Though Gonzales's salary history at MetPath is not made entirely clear by the record, it appears agreed that her annual salary at that point was $14,200.

In October 1982 Gonzales was asked to serve temporarily as acting operations manager, an important opportunity for her to show her qualifications for promotion into management. Her performance in the temporary assignment was excellent, and on December 14, 1982, MetPath offered to make her the operations manager, at an annual salary of $15,725. Gonzales told MetPath she considered the salary offer too low and wanted $20,000. MetPath rejected this proposal. Gonzales thus did not become operations manager. MetPath nonetheless raised her annual salary to $15,200, and reclassified her as a senior client service representative.

MetPath promptly looked for another candidate to fill the "operations manager" position. In January 1983 it hired John Wardell, an employee in MetPath's Phoenix, Arizona office, to fill the position at an annual salary of $18,870.

At Gonzales's request, a MetPath's executive gave her a written letter of reference, praising her effusively and describing her as "a rare find," "an impeccable performer," and "a prized asset for the company or person she chooses to work for." Gonzales left MetPath at the end of March 1983 to work for Central Diagnostic Laboratory, a major competitor of MetPath, as a public relations and sales representative, at a somewhat higher salary than she was earning at MetPath.

After filing a complaint on April 19, 1983, with the California Department of Fair Employment and Housing, Gonzales sued MetPath on October 28, 1983. Gonzales alleged she was a woman of Mexican-American ancestry and that MetPath had discriminated against her on the basis of both ancestry and gender by offering her a $15,725 salary for the operations manager position, then, after she declined the offer, agreeing to pay Wardell, a non-Hispanic man, a higher salary. In answers to interrogatories, Gonzales explained that MetPath's salary classification manual listed operations manager at a salary range of $17,745 to $25,642.

MetPath moved for summary judgment, contending, inter alia, that Gonzales had no evidence to support her claim that gender or ancestry discrimination was a basis for MetPath's offer to promote her to operations manager at a salary lower than the minimum scheduled level for that position, and that its decision to pay Wardell a higher salary than she had been offered was justified by Wardell's superior qualifications and by the pecuniary incentive needed to induce him to move from Phoenix to Los Angeles, where the cost of living is higher.

In support of its motion, MetPath adduced competent evidence showing the following: (1) Wardell's formal qualifications surpassed Gonzales's, in that Wardell had a two-year college degree, over two years' supervisory experience, and three years' experience as a courier, whereas Gonzales had only a "business college" education, no supervisory experience, and no full-time experience as a courier. (2) While Gonzales's most recent evaluation had been excellent, Wardell's had been even higher. (3) In addition to the higher cost of living in Los Angeles, Wardell faced unreimbursed relocation expenses of over $2,000. (4) Wardell had expertise, gained through supervisorial experience, in billing and in courier operations. The latter was the focus of the operations manager job, and Wardell was one of MetPath's strongest courier managers. Wardell had more experience in courier operations than Gonzales. Wardell also showed many other fine qualities, as did Gonzales.

Gonzales, in answers to interrogatories, stated that she was better qualified for the position of operations manager than Wardell, and that several of her fellow employees told her so after they met Wardell. Asked what facts supported her contention MetPath had unlawfully discriminated against her, she pointed to the salary offer below the stated range; MetPath's denial that its personnel policies permitted it to pay her more than it offered; the regional executives' failure to seek approval for her benefit of an exception to those policies; the fact that during one period she was expected to cover the duties of a vacant position while continuing to do her own job; her belief that if a male had accomplished what she had during her short stint as acting operations manager he would have been offered a higher salary; the fact that she was told that she would start as "operations manager I" even though the vacancy had been advertised as "operations manager II." Some of these items, she claimed, showed sex discrimination; others showed ancestry discrimination; one or two showed both.

■ Summary judgment is appropriate when no material facts are in dispute. At bench, the trial court properly granted MetPath's motion. Here, any minor factual disagreements the parties had were of no significance. The one material factual dispute, according to Gonzales, was whether

MetPath really determined its salary offers to her and to Wardell on the basis of business reasons, as it claims, or whether those business reasons were poorly thought out or, at worst, a mere post hoc pretext devised by MetPath to cover up its decision that a Mexican-American woman should be paid less than a non-Hispanic man.

Gonzales's claim that MetPath's executives' true motivation was a desire to pay minority women less than white men is based on no evidence other than the inference she claims should be drawn from the $60 per week difference between its initial offer to her and the salary it finally agreed upon with Wardell. This inference is so thoroughly rebutted by MetPath's factual showing that nothing remains of it, other than Gonzales's unsubstantiated suspicion that MetPath is lying about its business justifications.

█ In an employment discrimination case, the employee must first establish a prima facie of wrongful discrimination. If she does so, the burden shifts to the employer to show a lawful reason for its action. Then the employee has the burden of proving the proffered justification is mere pretext. (See *County of Alameda* v. *Fair Employment & Housing Com.* (1984) 153 Cal.App.3d 499, 504 [200 Cal.Rptr. 381].)

█ At bench, Gonzales did not even establish a prima facie case. Indeed, it is hard to fathom any legitimate justification she might have thought she had to bring this action. The Fair Employment and Housing Act prohibits discrimination "because of the race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, or sex" of any person. The statute does not prohibit every form of discrimination. "Discrimination" has become an ugly word in our society, because of its current connotation of racism. But we must remember that the word itself simply means the making of distinctions, i.e., perceiving differences. In the employment context, we have come to an impossible state of affairs if an employer is forbidden to perceive the difference between a good employee and an incompetent one, or between a good employee and a better one.

Yet that form of *discrimination* is precisely what the facts show here. Gonzales was a fine employee, as MetPath recognized. It treated her splendidly, advanced her rapidly, and praised her lavishly. A mere three years after it first hired this disabled bread-truck delivery driver, MetPath chose to reward her for exemplary service and demonstrate its unbridled confidence in her abilities by giving her the promotion she herself described as "the opportunity I had been waiting for"—a promotion from secretary to operations manager. When she rejected the offer because she considered inadequate to her needs the salary increase MetPath thought appropriate to

the circumstances, she was given a glowing reference—which she promptly used to find a better job with a competitor—and MetPath continued to look for a new operations manager. It found Wardell, another highly valued employee. Wardell's qualifications were somewhat different from Gonzales's, of course; it would be impossible for two individuals to have identical qualifications for a managerial position. Undoubtedly Wardell had certain strengths Gonzales lacked, and vice versa. Also, Wardell lived in Arizona, a fact making it harder to attract him to the position at a time when the high cost of living, overcrowding, and crime in Los Angeles have made it, in the view of many workers living elsewhere in the United States, an undesirable place to be transferred. Just as any two persons are different, Wardell was different from Gonzales, and MetPath recognized the distinction, and on that basis *discriminated* between them: after negotiations with Wardell, it settled on a figure higher than its initial offer to Gonzales.

Gonzales tries to turn this *discrimination* into unlawful discrimination on the basis of gender or ancestry, because Wardell is of different gender and ancestry from her. But, as Gonzales must have known from the start, there is absolutely no evidence that MetPath drew such a distinction. She does not claim MetPath officials ever displayed any racist or sexist attitudes on the job so far as she knew or was able to discover using the compulsory process this action afforded her. To the contrary, she does not deny that MetPath treated her well prior to the time it offered her the big promotion. Indeed, MetPath had gone to some lengths to preserve her position with the company when the job to which she was assigned was eliminated.

What we are presented with is nothing more or less than a suit based upon the claim that when an employer differentiates between two employees, and the two happen not to be of the same gender, or racial background, or religion, or nationality, or ancestry, etc., then the act of *discriminating* between the two is unlawful. Gonzales was, of course, unable to explain whether she thought MetPath's illegal motivation was gender discrimination or ancestry discrimination; all she knew was that since she differed from Wardell in those two respects, she claimed them as the basis for MetPath's differentiation of her from Wardell. In the absence of those two fortuitous differences, we have no doubt Gonzales would have claimed some other basis of unlawful discrimination—perhaps that Gonzales was divorced whereas Wardell was married or unmarried, or that Wardell was in better medical condition than she. After all, Gonzales has as much evidence of such unlawful discrimination—none—as she has of the presence of gender or ancestry discrimination.

Gonzales argues, without evidence, that MetPath's proffered justifications are mere pretext and must be submitted to a jury for evaluation.

To the contrary, the employment discrimination laws were never intended to turn the private-sector workforce into a new form of civil service, or to commission our courts to sit as personnel review boards to oversee business judgments made by private enterprises. Employers must be given wide latitude to make independent, good-faith personnel decisions without the threat of a jury second-guessing their business judgments. The decision to promote an employee to a managerial position at a particular initial salary requires evaluation of innumerable subjective considerations involving a prediction of her future performance. (See *Pugh* v. *See's Candies, Inc.* (1988) 203 Cal.App.3d 743, 769 [250 Cal.Rptr. 195] [review den.].) The courts cannot perform these evaluations anew.

Gonzales does the cause of equal employment opportunity a distinct disservice by bringing this baseless action. She and her counsel are undoubtedly driven by hopes of winning the jury lottery—by dreams of the pot of gold some juries find in the deliberation room and bring forth to bestow upon the lucky few. The effect on equal employment opportunity, however, is devastating, for this groundless action sends a clear message: Employers, beware your minority and female employees. By every business decision you make you subject yourself to the risk one of them will engulf you in protracted litigation which will inflict enormous legal expense, consume the time of your key employees, and distract your entire staff from your business mission. This risk is not lessened even when your business decision is to promote a minority woman from the secretarial ranks to a managerial position—a decision you might never have imagined would provoke her to condemn and sue you. Minority and female workers are therefore a potential danger to your business; try to avoid hiring them.

This unambiguous and unfortunate warning to employers is engraved on every page of this record. We will deny our imprimatur.

The judgment is affirmed. Pursuant to Government Code section 12965, subdivision (b), respondent shall recover from appellant the costs of this appeal plus an attorney's fee of $10,000.

Compton, J., concurred.

FUKUTO, J., Concurring.—I concur in the holding affirming the judgment of the trial court, and also in the observations about the limited role of the courts in overseeing personnel decisions made in the private sector. I do not fault plaintiff for filing this action, however, because plaintiff undeniably made a prima facie case of unlawful discrimination by proving that after she turned down MetPath's offer, MetPath offered the same promotion to Wardell, a nonminority male, at a substantially higher salary.

MetPath came forward, however, with a full and satisfactory reason for its higher offer to Wardell. It then became plaintiff's burden to show what facts she would prove at trial to undermine the justification MetPath advanced. It was plaintiff's total failure to meet this burden that resulted in dismissal of her case without trial. Unless she shows the motion is premature because she needs additional discovery, a plaintiff facing a summary judgment motion is not permitted to take the position that she will prove her case at trial by proof of facts which she is not yet ready to reveal. By way of overcoming MetPath's showing, all plaintiff was prepared to offer was (i) her opinion that she considered herself more highly qualified than Wardell and (ii) her inadmissible hearsay testimony that several coworkers had told her they shared her opinion. The trial court correctly found this evidence insufficient as a matter of law.