[No. B058529. Second Dist., Div. Three. July 28, 1994.]

FLORENCE E. BARBER et al., Plaintiffs and Respondents, v.
RANCHO MORTGAGE & INVESTMENT CORPORATION et al.,
Defendants and Appellants.

1822

COUNSEL

Call, Clayton & Jensen, Troy L. Tate, Seth L. Liebman, Janik, Lester & Dunn and Michael J. Grobaty for Defendants and Appellants.

Belshaw & Thompson and B. Elaine Thompson for Plaintiffs and Respondents.

## OPINION

**CROSKEY, J.**—In this appeal, we examine the merits of a judgment for compensatory and punitive damages, as well as a statutory award of attorney fees, entered in favor of the plaintiffs and respondents, Florence E. Barber (Florence) and Joe L. Barber (Joe) (collectively, the Barbers), following a six-day jury trial. The judgment was based, in substantial part, on alleged violations of federal credit and housing discrimination laws:[1] which the jury found to be true. The defendants and appellants, Rancho Mortgage & Investment Corporation (Rancho), Forecast Mortgage Corporation (Forecast) and Walker & Lee, doing business as Great Western Real Estate (Great Western), appeal the judgment on several grounds, primarily including claimed errors in jury instructions and the assertion that there was no substantial evidence to support the jury's verdict.[2]

We conclude that there was no error in the credit discrimination case against Rancho and affirm that portion of the judgment. The trial court erred in instructing the jury on the punitive damage claim in the housing discrimination case against Forecast and therefore we reverse that part of the judgment and remand for a new trial on that issue. Finally, we find no substantial evidence whatever of the housing discrimination claim against Great Western and reverse that portion of the judgment with directions to enter judgment in Great Western's favor.

### Factual and Procedural Background[3]

In March 1988, Forecast offered houses for sale in Victorville, California, at a project called "Meadowood." The selling prices were less than the appraised values for the homes and they were thus in great demand. The Barbers, who are Black and live in Gardena, California, a suburb of Los Angeles, learned about these homes from their son who then lived in the

---

[1]Provisions of the Civil Rights Act of 1964 prohibit discrimination in the purchase or sale of housing (42 U.S.C. § 1982). In addition, the Barbers rely on the Equal Credit Opportunity Act (15 U.S.C. §§ 1691-1691f (Credit Act); and the Fair Housing Act (42 U.S.C. §§ 3601-3631 (Housing Act). Under the terms of these federal statutes state courts have concurrent jurisdiction of private enforcement actions. (15 U.S.C. § 1691e(f); 42 U.S.C. § 3613(a)(1)(A).) This means that the applicable law is the federal substantive law; however, California rules of procedure apply to the trial and our review of the judgment.

[2]The Barbers also alleged and recovered on a claim for breach of contract against Forecast. However, no appeal has been taken by Forecast from that portion of the judgment.

[3]In accordance with the usual rules on appeal (and except for our consideration of the claim of erroneous jury instructions), we view the facts and all reasonable inferences therefrom in the light most favorable to the Barbers as the parties who prevailed in the jury trial below. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

Victorville area. On March 18, 1988, after viewing the model homes, the Barbers placed their name on a waiting list. The next day their name was called and, with the assistance of one Ron Chapman, an employee of Great Western, they viewed the homes remaining for sale. Finding one that they liked, they filled out a purchase and sale agreement, as well as other related documentation. This offer was accepted by Forecast, subject to the contingency that the Barbers obtain financing for the purchase price, and an escrow was opened.

As a first step in obtaining the required financing, the Barbers also spoke with one Glen Wilson, a "loan application taker" employed by Rancho, who was working at the site where Forecast was selling the homes.[4] He looked at their financial documents and prequalified them for a FHA loan from Rancho. At Chapman's suggestion, the Barbers decided to formally apply for an FHA loan to finance their purchase. Such a loan required a low 5 percent down payment but was available *only* to borrowers who intended to live in the purchased home. This is the so-called "owner-occupied" rule which is very much at the heart of the dispute in this matter. On March 20, 1988, the Barbers completed and submitted a residential loan application to Rancho.[5]

Subsequently, on March 24, 1988, Rancho requested additional documentation which the Barbers supplied.[6] On May 9, 1988, they had a meeting with one of Rancho's loan processors. Both Joe and Florence testified that the processor treated them with both rudeness and belligerence.[7] Documents and information which had previously been supplied were requested again. The processor asked them a lot of questions about whether they really intended to live in Victorville and commute to work in Los Angeles.[8] The Barbers insisted that it was their intent to make such a commute; indeed, they intended to carpool with their son and daughter-in-law who also worked in Los Angeles. They very much wanted to get out of the crowded and

---

[4]Apparently, Rancho was the financial institution which had agreed to provide Federal Housing Authority (FHA) financing to all qualified purchasers located by Forecast.

[5]An examination of this application reflects that the Barbers left blank the answer to the question of whether they intended to occupy the home or not. However, Florence testified at trial that it was the intention of her and her husband to move into the house as soon as the escrow closed.

[6]Rancho requested such items as the Barber's W-2 forms for the previous two years, copies of their drivers' licenses and a letter explaining why it was their intention to relocate some 75-80 miles from their places of employment in Los Angeles.

[7]The rudeness included the loan processor's act of sucking on a sucker throughout the meeting.

[8]Joe worked for the traffic enforcement division of the City of Los Angeles and Florence was employed by the Los Angeles Unified School District.

crime-ridden urban area in which they lived. They also responded to every demand made upon them by Rancho for additional documents and information, including those which were duplicative.

The Barbers heard nothing more about their loan application until May 22, 1988, when Florence received a telephone call from Anne Merryfield, a loan officer at Rancho. Merryfield advised them that Rancho had not approved the Barbers for an "owner-occupied" loan because it appeared that they were really investors who had no intent to live in the home as required. The decision to deny a loan to the Barbers was made by Darlene Tennent, one of Rancho's underwriters. She had the sole responsibility for deciding whether to qualify the Barbers for an owner-occupied loan. She testified at trial that her decision to deny the Barbers' application was based on FHA guidelines which indicated that applicants who (1) already had a primary residence which was reasonably close to their long-standing places of employment, (2) owned other rental units[9] and (3) would be required to engage in a long commute to work were more likely to be investors rather than persons who would really occupy the home for which the FHA loan was being sought. Tennent testified that when she discussed these circumstances with an official at FHA she was advised to reject the application. However, testimony by another FHA official was to the effect that the FHA did not make recommendations or give direction to lenders regarding the acceptance or rejection of loan applications.[10] The testimony of the Barbers, which we must accept as true, was that they had consistently expressed their intent to live in the house and that they did in fact have such an intent.

Neither Tennent nor anyone else at Rancho gave the Barbers any written confirmation or explanation for the rejection of their loan. This itself was a violation of the Credit Act.[11] Indeed, the record demonstrates that after the Barbers were informed on May 22, 1988, that their loan application had been

---

[9]The evidence reflected that in addition to owning a primary residence in Gardena, the Barbers also owned a rental fourplex (i.e., a residential apartment building with four units).

[10]However, this same FHA official also testified that the FHA counsels loan underwriters to look for the following red flags when considering whether an owner-occupied loan can be made: (1) ownership of other properties (counting each unit of a rental property separately), (2) a long commute and (3) a trade down in value. If the Barbers were truly going to give up their Gardena home, they would be trading a $180,000 residence for one that cost less than $68,000.

[11]The relevant portions of 15 United States Code section 1691(d) provide:

"(d)(1) Within thirty days (or such longer reasonable time as specified in regulations of the Board for any class of credit transaction) after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application.

"(2) Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by—

rejected they made several attempts to obtain more information but neither anyone at Rancho nor anyone at the FHA would ever return their calls, except for one FHA official who promised to set up a meeting with a representative from Rancho but never did. Thus, it was never explained to them why their expressed intention to immediately occupy the home was not accepted as true; nor were they ever told by any of the defendants that they could have (1) applied for a non-FHA loan, (2) obtained a loan from a source other than Rancho, or (3) simply paid cash for the home which, the Barbers testified, they were capable of doing.[12]

On or about July 20, 1988, the Barbers were notified that the escrow, which had previously been opened to handle their purchase of the home, had been cancelled as of that date. The escrow officer testified that she had been instructed by Forecast to cancel the escrow and return the Barbers' cash down payment which had accompanied their original offer. Since Forecast had a backup offer for the home, it was promptly sold to another buyer.[13]

Plaintiffs then filed this action.[14] They alleged six separate counts: (1) credit discrimination (against Rancho only), (2) housing discrimination (against Forecast and Great Western only), (3) conspiracy to discriminate (against all defendants), (4) breach of contract (against Forecast only), (5) conspiracy to breach contract (against all defendants) and (6) intentional infliction of emotional distress (against all defendants).

After a six-day jury trial, the trial court granted defendants' motions for a directed verdict as to the third and fifth causes of action relating to a

---

"(A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or

"(B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

"(3) A statement of reasons meets the requirements of this section only if it contains the specific reasons for the adverse action taken."

[12]Rancho makes much of the fact that the Barbers never offered to pay cash or attempted to apply for a loan with less restrictive limitations. However, this seems to us very much like a mitigation of damage argument which is really irrelevant to the fundamental discrimination claims which the Barbers have raised.

[13]The Barbers testified that they fully realized that they were not going to be able to purchase the home when they drove by it in July 1988 and saw that another family had already moved in.

[14]The record does not reflect the date when the original complaint was filed. However, the first amended complaint, which is the operative pleading on which the case was tried, was filed on June 14, 1989.

conspiracy (1) to discriminate against the Barbers (2) and to cause Forecast to breach the sale agreement.[15] The trial court also granted defendants' directed verdict motion as to the sixth cause of action for infliction of emotional distress.[16] The case went to the jury on (1) the credit discrimination claim against Rancho, (2) the housing discrimination claim against Forecast and Great Western and (3) the breach of contract claim against Forecast.

On February 26, 1991, the jury returned a verdict in favor of the Barbers on all three of their remaining causes of action. They found that Rancho had committed acts of credit discrimination proscribed by federal law and awarded general damages to the Barbers in the sum of $25,000. The jury also concluded that punitive damages should be awarded against Rancho. The trial judge subsequently set the amount of such damages at $10,000.

The jury concluded that Forecast had breached its contract of sale with the Barbers and awarded compensatory damages in the amount of $11,725.[17] The jury also found that Forecast had engaged in acts of housing discrimination proscribed by federal law and awarded the Barbers general damages of $25,000 and punitive damages of $150,000. Similarly, they found Great Western likewise liable for housing discrimination and awarded the Barbers $25,000 general damages and $125,000 punitive damages. A judgment reflecting these damage awards was filed on March 11, 1991.[18] Thereafter, on May 2, 1991, after denying the defendants' motions for a new trial and

---

[15]The trial court, in making its rulings with respect to the two conspiracy causes of action, stated: "The court concludes that there is no evidence [of a] scheme or any evidence from which inferences could be drawn as to a plan or scheme. . . ."

[16]In granting this motion the trial court stated: ". . . The court finds that the case law does hold that use of racial epithets and slurs has been held sufficient to state a claim for intentional infliction of emotional distress . . . . In this case, however, there is no testimony of course of racial epithets and slurs. No action that is reprehensible per se. Only if the jury finds discrimination on the evidence, of course, then we have a serious infraction here, and we have a separate cause of action for that. The acts in themselves, though, that are testified to and the testimony that was given are not so extreme and outrageous as to shock the conscience of civilized society. Rudeness, bad manners, insulting language, even though they certainly are not something to be condoned, are the [sic] not the kind of reprehensible conduct that would support the kind of cause of action for intentional infliction of emotional distress, reckless disregard for likelihood of causing emotional distress. Sucking a sucker, curtness, lack of patience, and so on, as I noted certainly cannot be condoned, but those are not the kinds of actions that one would expect to cause serious emotional distress. Unfortunately, our society is not in many instances conducting itself perhaps the way it ought to. So the evidence viewed in light most favorable to the [Barbers] and drawing all reasonable inferences in their favor does not support a verdict for intentional infliction of emotional distress . . . ."

[17]As already noted, Forecast does not appeal from this portion of the judgment.

[18]Actually, it is an "amended" judgment; the original judgment was entered upon the jury's verdict, but the trial court subsequently made its order, on Barbers' ex parte motion, awarding

judgment notwithstanding the verdict, the court granted Barbers' motion for an award of statutory attorney fees ($60,000) and costs ($2,709.30).

The defendants filed this timely appeal.

### Contentions of the Parties

The defendants contend there was no substantial evidence of either credit or housing discrimination against the Barbers. They also argue that the jury was improperly instructed with respect to punitive damages. Forecast and Great Western contend that the award of punitive damages against them cannot stand in any event because no evidence of their financial net worth was offered or presented by the Barbers.

The Barbers, of course, dispute each of these arguments and contend that sufficient evidence of defendants' discriminatory activities was presented and the compensatory and punitive awards, as well as the allowance of attorney fees, were proper and should be affirmed.[19]

### DISCUSSION

#### 1. Standard of Review

The two principal contentions before us, a lack of substantial evidence and improper jury instructions, present different problems upon appellate review.

■ With respect to the first, it is now settled law that *"substantial evidence"* is not just any evidence but must be evidence *" 'of ponderable legal significance, . . . reasonable in nature, credible, and of solid value.'* [Citations.]" (*Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873 [197 Cal.Rptr. 925].) As the *Bowers* court put it, the existence of substantial evidence is determined by the appellate court in the following manner: "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record,* there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be*

---

$10,000 in punitive damages against Rancho. Under the applicable federal statute, the *amount* of such damages was an issue which was for the trial court, not the jury, to resolve.

[19]The Barbers did not cross-appeal from the trial court's orders directing verdicts against them on their conspiracy and emotional distress causes of action.

*found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.* [Citations.]" (*Id.*, at pp. 873-874, italics added in the original; see also *Greenfield* v. *Insurance, Inc.* (1971) 19 Cal.App.3d 803, 810 [97 Cal.Rptr. 164].)

■ "However, with respect to our review of the issues relating to improper jury instructions and the question of their prejudicial impact [citation], we are not required to make such inferences in [Barbers'] favor. To the contrary, we must assume that the jury, had it been given proper instructions, might have drawn different inferences more favorable to [defendants] and rendered a verdict in [their] favor on the issues as to which it was misinstructed. [Citation.]" (*Mock* v. *Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 322 [5 Cal.Rptr.2d 594].)

## 2. *Burden of Proof in a Discrimination Case*

In considering this appeal we place considerable emphasis on the fact that the trial court granted defendants' motion for a directed verdict on the Barbers' conspiracy claim. (See fn. 15, *ante.*) Thus, the Barbers' discrimination claims against each of the three defendants must necessarily stand on their own and the evidence supporting such claims must be evaluated in light of what it shows about the specific conduct of each particular defendant.

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." (42 U.S.C. § 1982.) This statutory expression of the fundamental civil right of every citizen to purchase and own real property is central to the Barbers' claim.

■ In order to establish a claim for racial discrimination under United States Code section 1982 involving housing a plaintiff must show that (1) he or she is a member of a racial minority, (2) the plaintiff applied for and was qualified to rent or purchase certain property or housing, (3) his or her bid to rent or buy was rejected, and (4) the housing or rental opportunity remained available thereafter. (*Phiffer* v. *Proud Parrot Motor Hotel, Inc.* (9th Cir. 1980) 648 F.2d 548, 551.) These are the basic elements of a discrimination case not only in housing but also in employment, labor relations and school discrimination cases. (*Williams* v. *Matthews Company* (8th Cir. 1974) 499 F.2d 819, 826.) They apply to cases brought under the Credit Act as well as under the Housing Act. (*Cragin* v. *First Federal S & L Ass'n* (D.Nev. 1980) 498 F.Supp. 379, 384.)

In *Texas Dept. of Community Affairs* v. *Burdine* (1981) 450 U.S. 248 [67 L.Ed.2d 207, 101 S.Ct. 1089], the United States Supreme Court described a

discrimination plaintiff's obligation with respect to proving a prima facie case and the burden-shifting analysis which then must be applied. Although *Burdine* was an employment case, the standards which it articulated apply with equal force here. "[A] plaintiff must prove by a preponderance of the evidence that [he or she sought to purchase available property and could qualify as a buyer] but was rejected under circumstances which give rise to an inference of unlawful discrimination. The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection. [Citation.] . . . [T]he prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors' [quoting from *Furnco Construction Corp.* v. *Waters* (1978) 438 U.S. 567, 577 (57 L.Ed.2d 957, 967-968, 98 S.Ct. 2943)]. Establishment of the prima facie case in effect creates a presumption that the [seller or lender] unlawfully discriminated against the [buyer or borrower]. If the trier of fact believes the plaintiff's evidence, and if the [seller or lender] is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." (*Id.* at pp. 253-254 [67 L.Ed.2d at pp. 215-216].)

The *Burdine* court went on to describe the burden-shifting analysis which is to be applied when the defendant offers a nondiscriminatory explanation. ██ "The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. [Citation.] It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

"The plaintiff retains the burden of persuasion. [He or she] now must have the opportunity to demonstrate that the proffered reason was not the true

reason for the [defendant's] decision. This burden now merges with the ultimate burden of persuading the court that [he or she] has been the victim of intentional discrimination. [He or she] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence. [Citation.]" *(Texas Dept. of Community Affairs* v. *Burdine, supra,* 450 U.S. at pp. 254-256 [67 L.Ed.2d at pp. 216-217], fn. omitted; see also *McDonnell Douglas Corp.* v. *Green* (1973) 411 U.S. 792 [36 L.Ed.2d 668, 93 S.Ct. 1817].)

■ More recently, the Supreme Court has held that where the trier of fact disbelieves the defendant's claimed nondiscriminatory reasons for its conduct, then, without any further evidence, an inference of intentional discrimination is justified. "The defendant's 'production' (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven 'that the defendant intentionally discriminated against [him]' because of his race. [Citation.] *The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.* Thus, rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and [it is correct to say] that, upon such rejection, '[n]o additional proof of discrimination is *required*,' [citation] (italics added)." *(St. Mary's Honor Center* v. *Hicks* (1993) 509 U.S. __ [125 L.Ed.2d 407, 418-419, 113 S.Ct. 2742, 2749], first italics added, fn. omitted.) This decision, which in our view is entirely consistent with *Burdine,* effectively puts to rest any confusion which may have been raised by the language used in a number of cases which had granted summary judgment to a discrimination defendant who presented evidence of a nondiscriminatory reason for the challenged conduct which was not rebutted by the plaintiff's evidence.[20]

With these principles in mind, we now turn to an examination of the claims against each of the defendants.

---

[20]Prior to the decision in *St. Mary's Honor Center* v. *Hicks, supra,* several California appellate courts and numerous federal appellate circuits had granted summary judgment in favor of an employer who came forward with nondiscriminatory reasons for the challenged conduct which was not rebutted by the specific evidence offered by the plaintiff attacking the reasons given as pretextual. (*Walker* v. *Blue Cross of California* (1992) 4 Cal.App.4th 985, 996 [6 Cal.Rptr.2d 184]; *University of Southern California* v. *Superior Court* (1990) 222 Cal.App.3d 1028, 1039 [272 Cal.Rptr. 264], and cases cited therein; *Gonzales* v. *MetPath, Inc.* (1989) 214 Cal.App.3d 422, 427-428 [262 Cal.Rptr. 654]; *Medina-Muno* v. *R.J. Reynolds Tobacco Co.* (1st Cir. 1990) 896 F.2d 5; *Steckl* v. *Motorola, Inc.* (9th Cir. 1983) 703 F.2d 392, 393; *Mitchell* v. *Peralta Community College Dist.* (N.D.Cal. 1991) 766 F.Supp. 834, 837.)

### 3. *Claims Against Rancho*

 The Barbers concede that their evidence against all of the defendants is circumstantial. They correctly note that, "[v]ery seldom, if ever, is there direct evidence of discrimination, . . . ." The evidence presented by the Barbers against Rancho may be summarized as follows: (1) they are a Black couple; (2) their loan was suspended in early May 1988, but they were never notified of that suspension although they were orally advised on May 22 that their loan application had been rejected; (3) over a month earlier, on April 11, 1988, Forecast was notified that the loan may not go "owner-occupied," but no such notification was given to the Barbers; (4) the Barbers never received a specific explanation as to why their loan was denied until after they filed this action and they were never given such notice and explanation in writing as required by the provisions of the Credit Act; (5) even though Rancho was in the business of making loans, it made no effort to preserve the Barbers' financing request by offering them a non-FHA loan which would not include an "owner-occupied" restriction; (6) the Barbers were treated rudely by Rancho employees, given the "run around" when they sought information about the status and progress of their loan application, and were repeatedly asked to supply information and documentation previously delivered; and (7) Rancho, while claiming to apply FHA guidelines which suggested that the Barbers might actually be "investors," never attempted to interrogate the Barbers as to whether they really intended to live in Victorville (as the jury ultimately believed) or why they were willing to make the 75-mile daily commute to Los Angeles from Victorville; Rancho simply disapproved the loan based on the information in the Barbers' application without making any effort to actually investigate and determine if the inference which they had chosen to draw from such information was the correct one.

The question we must resolve is whether such evidence is sufficient to support the jury's conclusion that Rancho unlawfully discriminated against the Barbers in violation of the Credit Act which provides, "It shall be unlawful for any creditor to discriminate against any applicant, with respect to any credit transaction—(1) on the basis of race, . . ." (15 U.S.C. § 1691(a)(1).)

Clearly, the evidence offered by the Barbers established prima facie discriminatory conduct (15 U.S.C. § 1691(a); 42 U.S.C. § 1982). Rancho tendered the explanation, which it claimed was nondiscriminatory, that the information available to it indicated that the Barbers did not qualify for FHA financing so their application was rejected. In other words, the loan application was rejected not because the Barbers were Black but because the

information in their application caused Rancho to believe that they could not meet the "owner-occupied" requirement.

The jury was entitled to disbelieve this explanation, given the context of all of the evidence presented. Such rejection, taken together with the prima facie case presented by the Barbers, was sufficient to establish a case of unlawful discrimination. (*St. Mary's Honor Center* v. *Hicks, supra,* 509 U.S. __ [125 L.Ed.2d at pp. 418-419, 113 S.Ct. at p. 2749].) Thus, there was substantial evidence to support the jury's verdict.

However, such conclusion does not necessarily establish that the imposition of $10,000 in punitive damages was proper. The Credit Act has specific provisions relating to the award of damages. "(a) Any creditor who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for any actual damages sustained by such applicant . . . . [¶] [and also] (b) . . . shall be liable to the aggrieved applicant for punitive damages in an amount not greater than $10,000, in addition to any actual damages provided in subsection (a)." (15 U.S.C. §§ 1691e(a) & (b).) The statute also spells out the standards which the court shall apply in fixing the amount of punitive damages. "In determining the amount of such damages in any action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional."

Under this statutory provision, punitive damages can be imposed against *any* creditor who fails to comply with *any* requirement of the subchapter. While the use of the word "shall" does not require a punitive award for every violation of the act (*Shuman* v. *Standard Oil Co. of California* (N.D.Cal. 1978) 453 F.Supp. 1150, 1152, fn. 1), it would seem clear, given the statutory standards to be applied, that malicious or oppressive conduct is *not* required.

In *Anderson* v. *United Finance Co.* (9th Cir. 1982) 666 F.2d 1274 the court addressed this issue directly. "The [Credit] Act specifies certain factors to be considered when determining the appropriateness of punitive damages. Although the traditional word 'punitive' is used, one of the factors to be considered is whether the creditor's non-compliance was intentional. *This suggests that punitive damages could be awarded even though the creditor's actions were not wanton, malicious or oppressive.* [Citation.] [¶] ▮ *Thus, courts are allowed to award punitive damages under § 1691e(b) even though*

*the creditor's conduct is not wanton, malicious or oppressive, in order to increase the incentive for creditor compliance.* This incentive is particularly appropriate when actual damages are difficult to prove. However, since punitive damages are awarded to punish the defendant and to serve as an example or warning to others not to engage in similar conduct, they are only justified when the defendant has committed a particularly blameworthy act. [Citation.] [¶] Consequently, we hold that punitive damages may be awarded pursuant to § 1691e(b) if (1) the creditor wantonly, maliciously or oppressively discriminates against an applicant, *or (2) the creditor acts in 'reckless disregard of the requirements of the law', even though there was no specific intention to discriminate on unlawful grounds.* [Citation.] This determination is to be made by considering all the relevant factors, particularly those listed in § 1691e(b) itself." *(Id.* at p. 1278, italics added; see also *Shuman* v. *Standard Oil Co. of California, supra,* 453 F.Supp. at pp. 1154-1155.)

█ Rancho does not dispute that *Anderson* sets forth a correct statement of the statutory legal standards to be applied, but contends that (1) there was no substantial evidence to demonstrate a basis for punitive damages and (2) the trial court erred in making the award without first making the necessary findings. █ Dealing with the second argument first, it is only necessary to note that the court's judgment is presumed correct *(Foreman & Clark Corp.* v. *Fallow* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]) and all findings necessary to support the judgment are presumed to have been made. *(Booth* v. *Robinson* (1983) 147 Cal.App.3d 371, 377 [195 Cal.Rptr. 130].) This rule is particularly apt where, as in this case, there was no request that the court make any specific findings.

█ Rancho is also incorrect when it argues that there was no evidence of a violation of the Credit Act. It is undisputed that Rancho did not comply with the statute when it failed to provide the Barbers with a *written* explanation of the reasons for rejection of their loan application. (15 U.S.C. § 1691(d).) A timely and complete written explanation might have enabled the Barbers to provide additional information which would have allayed Rancho's suspicions as to their "investor" status or, at least, have given the Barbers an opportunity to make alternative financing arrangements. On this record, the trial court could reasonably conclude that Rancho had acted in a "reckless disregard of the requirements of the law." Such a conclusion would satisfy one of the alternative requirements for award of punitive damages under 15 United States Code section 1691e. *(Anderson* v. *United Finance Co., supra,* 666 F.2d at p. 1278.)

### 4. *Claims Against Forecast*

█ As the Barbers point out, the record reflects the following evidence that Forecast had discriminated against them. The Barbers had sufficient

assets to finance or, if necessary, purchase for cash the home described in their sale contract. However, at no time after the opening of escrow did anyone at Forecast contact them and demand funds by a certain date or advise them that their failure to provide funds would result in cancellation of the escrow. Although Forecast (but not the Barbers) was advised by Rancho on April 11, 1988, that the Barbers' FHA loan application was in trouble, no effort was made to save the transaction with other financing means, including the payment of cash.[21] The escrow was unilaterally cancelled by Forecast on July 20 on the stated ground (which was not true) that the Barbers had never signed the escrow instructions.[22] While the Barber escrow was still pending, Forecast entered into two other ("backup") purchase and sale agreements with potential buyers for the same home. One of those buyers ended up closing escrow on the home and moving in even *before* the Barber escrow was cancelled. Finally, Forecast presented no evidence that any of the other Meadowood homes had been sold to Blacks although there was evidence that Forecast had made sales in the past to "minorities" generally.[23]

In our view, such evidence of Forecast's conduct was sufficient to meet the Barbers' prima facie burden of proof. In addition to the general proscription against racial discrimination, it is also unlawful under 42 United States Code section 3604(a), for a seller of housing to refuse to sell, after the making of a bona fide offer, a dwelling to any person "because of race. . . ."

As already noted (see fn. 22, *ante*), Forecast's evidence of a nondiscriminatory reason for cancellation of the escrow contradicted the earlier false reason actually given the Barbers at the time. Certainly, the jury was justified in its conclusion that such "explanation" was not worthy of belief. We thus have no trouble concluding that the jury properly found that Forecast had engaged in prohibited discriminatory conduct.

However, the issue of the punitive damage award is another matter. The provisions of 42 United States Code section 3613(c)(1) permit the

[21]The Barbers testified that they communicated with Forecast on several occasions about when escrow would close and they could expect to move in. Such testimony, which we must accept as true, demonstrates that Forecast had multiple opportunities to inform the Barbers of any problems or difficulties in concluding the sale.

[22]We note with some interest that on appeal Forecast *now* contends that the reason the escrow was cancelled and the home sold to another was because the Barbers did not qualify for the FHA loan which was a condition of the escrow.

[23]The jury was certainly entitled to consider the lack of evidence indicating sales to other Black buyers. BAJI No. 2.02 was included in the instructions read to the jury: "If weaker and less satisfactory evidence is offered by a party, when it was within his power to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust."

award of punitive damages whenever the trial court determines that housing discrimination has occurred. No standards for such an award are set forth. They have been established by federal case law. "Actual malice . . . is unnecessary to support an award of punitive damages in racial discrimination cases. It need only be shown that the defendant has acted 'with such conscious and deliberate disregard of the consequences of his actions to others that his conduct is wanton.' [Citation.]" (*Phiffer* v. *Proud Parrot Motor Hotel, Inc., supra,* 648 F.2d at p. 553.) Unfortunately, the jury was neither advised nor instructed as to the nature of the conduct on the part of Forecast which would justify a punitive award. They were simply told, "you may award such damages if you find defendants responsible for discrimination."[24]

The jury was not instructed on malice or oppression as would be required on a state punitive claim. (See BAJI No. 14.72.1.) We have no quarrel with that, except that the jury should have been told the nature of a defendant's behavior which, under federal law, would justify a punitive award. The standard described above (*Phiffer* v. *Proud Parrot Motor Hotel, Inc., supra,* 648 F.2d at p. 553) should have been included. As *Phiffer* and other cases make clear, in housing discrimination cases, unlike credit discrimination cases under 15 United States Code section 1691e, wanton conduct *is* required. ■■■■■■ The question arises whether the failure to so instruct the jury was prejudicial to Forecast.[25]

■■ " 'Article VI, section 13 of the California Constitution provides that error in instructing the jury shall be grounds for reversal only when the

[24]The jury was given a modified version of BAJI No. 14.73: "If you find that plaintiff suffered damages as a proximate result of the conduct of the defendants on which you base a finding of liability, you may then consider whether you should award punitive damages against defendants for the sake of example and by way of punishment. *You may award such damages if you find defendants responsible for discrimination.* [¶] The law provides no fixed standards as to the amount of such punitive damages, but leaves the amount to the jury's sound discretion, exercised without passion or prejudice. [¶] In arriving at any award of punitive damages, you are to consider the following: [¶] (1) The reprehensibility of the conduct of the defendants, [¶] (2) The amount of punitive damages which will have a deterrent, effect on the defendants in the light of defendants' financial condition, [¶] (3) That the punitive damages must bear a reasonable relation to the actual damages. [¶] If you find that plaintiff is entitled to an award of punitive damages against defendants, you shall state the amount of punitive damages separately in your verdict." (Italics supplied.)

[25]The Barbers argue that Forecast waived its objection to the jury instruction on punitive damages. That argument is without merit. On this record, no such waiver occurred. If an instruction is legally *erroneous,* as we find to be the case here, it is deemed excepted to and the failure of the appellant to have objected to the instruction or offered a proper one will not constitute a waiver. (Code Civ. Proc., § 647; *Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 948-949 [160 Cal.Rptr. 141, 603 P.2d 58]; *Mock* v. *Michigan Millers Mutual Ins. Co., supra,* 4 Cal.App.4th at pp. 333-334.)

reviewing court, "after an examination of the entire cause, including the evidence," concludes that the error "has resulted in a miscarriage of justice." The test of reversible error has been stated in terms of the likelihood that the improper instruction misled the jury. [Citation.]' [Citations.] Thus, if a review of the entire record demonstrates that the improper instruction was so likely to have misled the jury as to become a factor in the verdict, it is prejudicial and a ground for reversal. [Citation.] 'To put it another way, "[w]here it seems probable that the jury's verdict may have been based on the erroneous instruction prejudice appears and this court 'should not speculate upon the basis of the verdict' " [Citations.]' [¶] 'The determination whether, in a specific instance, the probable effect of the instruction has been to mislead the jury and whether the error has been prejudicial so as to require reversal *depends on all of the circumstances of the case*, including the evidence and the other instructions given. No precise formula can be drawn.' [Citations; italics in original.] Among the factors which are considered are (1) the degree of conflict in the evidence on critical issues and (2) the effect of other instructions in remedying the error. [Citation.]" (*Mock* v. *Michigan Millers Mutual Ins. Co.*, *supra*, 4 Cal.App.4th at p. 335.)

As we have said in the past, we read the phrase "conflict in the evidence" as another way of describing the closeness of the case (*Mock* v. *Michigan Millers Mutual Ins. Co.*, *supra*, 4 Cal.App.4th at p. 335.) ▮▮▮ The evidence presented against Forecast on the issue of the wanton nature of its conduct is far from clear. Indeed, it would, in our judgment, barely satisfy the test for "substantial evidence." For example, the evidence offered was both circumstantial and equivocal and no evidence whatever of any prior history of discriminatory activity was even offered. Thus, on this issue, this case was very close indeed. The other relevant factor likewise suggests prejudice to Forecast. There were no additional jury instructions which otherwise supplied to the jury the missing information. In short, the instructions as given, simply authorized the jury to award punitive damages in their "sound discretion" once they found that Forecast was responsible for a discriminatory act. We do not believe that simply telling the jury to "consider" the "reprehensibility" of Forecast's conduct was sufficient.

After examining the case as a whole (*Butigan* v. *Yellow Cab Co.* (1958) 49 Cal.2d 652, 660-661 [320 P.2d 500, 65 A.L.R.2d 1]) and applying the two relevant factors mentioned above (*LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946]; see also *Weiner* v. *Fleischman* (1991) 54 Cal.3d 476, 490 [286 Cal.Rptr. 40, 816 P.2d 892]), we can only conclude that the trial court's failure to tell the jury that proof of wanton conduct was required, together with an explanation of what

is required to demonstrate such conduct, was prejudicial to Forecast. ▮▮▮▮ A retrial of the issue of punitive damages and their amount is therefore required.[26]

## 5. *Claims Against Great Western*

▮▮ The case against Great Western, if it can even be called that, causes us the most concern. The Barbers concede that an employee of Great Western was the first person with whom they had contact in this matter, one Ron Chapman. They conceded at trial that Chapman, who showed them available homes and negotiated and caused the execution of the purchase and sale agreement, did nothing that they felt was in any way discriminatory. Indeed, it appears he did everything he could to bring about the conclusion of the sale.

The evidence upon which the Barbers rely is that (1) the escrow never closed, (2) their telephone calls of inquiry to Great Western as to the status and progress of the sale were not returned, and (3) Great Western, as Forecast's broker, signed up the backup buyer who eventually did buy the house. That is their entire case. They also emphasize that Great Western presented no witnesses at trial and thus did not rebut the Barbers' charge.

This claim should not have been sent to the jury. Given that the trial judge had directed a verdict on Barbers' conspiracy claims, any cause of action against Great Western had to stand on its own individual evidentiary merit. However, the case had no merit. No reasonable jury could possibly find a prima facie case of racial discrimination based on these facts.

What circumstances are present here which give rise to any reasonable inference of unlawful discrimination? We can find none. What the evidence

---

[26]We do not reach Forecast's other claimed errors with but one exception; they would not have merited discussion in any event. However, it is appropriate to comment on Forecast's argument that the Barbers' failure to offer evidence of Forecast's financial net worth would require reversal of the punitive damage award. (*Adams* v. *Murakami* (1991) 54 Cal.3d 105, 108-109 [284 Cal.Rptr. 318, 813 P.2d 1348].) This argument is without merit. *Murakami* expressly held that such evidence was a *prerequisite* to the recovery of punitive damages and that the burden of providing such evidence must fall upon the plaintiff. This effectively imposed a new element which a plaintiff is required to establish in order to prove a punitive damage claim. As such, it directly affects the outcome of the litigation of that issue. It is thus a matter of substantive law. Federal law, not state law, therefore applies. We also note that Forecast in its opening brief concedes that federal law controls the punitive damage issue. The federal rule on this issue is that such evidence is *not* required of the plaintiff; if a defendant wishes the jury to consider such evidence then he, not the plaintiff, is required to produce it. (*Woods-Drake* v. *Lundy* (5th Cir. 1982) 667 F.2d 1198, 1203, fn. 9; *Tri-Tron Intern.* v. *Velto* (9th Cir. 1975) 525 F.2d 432, 438.)

does show is that Great Western, doubtless trying to earn its commission, tried hard to sell the house to the Barbers. That the sale fell through was result of decisions made by others. Great Western had no part in it. That it signed up the backup buyer was only reflective of the discharge of its responsibilities to its principal, Forecast. When the conspiracy allegations were found to be unsupported, the case against Great Western disappeared as well.

Great Western's appeal from the judgment is well taken. It should be reversed with directions to enter judgment in its favor.

## DISPOSITION

As to Rancho, the judgment, except for the award of attorney fees, is affirmed. As to Forecast, the judgment is affirmed in part and reversed in part and the matter is remanded for a new trial on the issue of punitive damages and the amount thereof, if any. As to both Rancho and Forecast, the award of $60,000 in attorney fees is reversed with directions to reconsider such award, and any allocation thereof which may be appropriate, upon the conclusion of the retrial of the punitive damages claim against Forecast and in light of our conclusion that the judgment against Great Western must be reversed. As to Great Western, the judgment is reversed with directions to enter judgment in favor of Great Western. The Barbers shall recover their costs on appeal from Rancho in such reasonable proportion of their total appellate costs as the trial court may determine; the Barbers and Forecast, as between themselves, shall bear their own costs on appeal; and Great Western shall recover its costs on appeal from the Barbers.

Klein, P. J., and Kitching, J., concurred.

A petition for a rehearing was denied August 25, 1994.