[No. G013473. Fourth Dist., Div. Three. Aug. 30, 1994.]

GEORGE F. GREEN III et al., Plaintiffs and Respondents, v. RANCHO SANTA MARGARITA MORTGAGE COMPANY, Defendant and Appellant.

**COUNSEL**

Alevizon, Smith, Susson & Palafox and Robert L. Green for Defendant and Appellant.

Walter Greene, Jr., for Plaintiffs and Respondents.

**OPINION**

**SILLS, P. J.**—When George and Elizabeth Green went to a mortgage broker to obtain a loan for the new $440,000 house they wanted to buy in Coto de Caza, they had a monthly income in excess of $16,000, more than $50,000 in savings, and six pieces of real property with a *net* value of $290,000. Their debts (exclusive of encumbrances on their real property) were less than $35,000, and over 70 percent of *that* represented car loans. Despite the fact that there were lenders willing to make the Greens a loan, the lending officer at the mortgage broker told Elizabeth Green that she could not find "a lender" who would accept them, and then later changed her records to suggest that she only said she could not find "an A lender" (meaning a high quality lender, as distinct from a "B" lender of lower quality).

The Greens are Black. As explained below, the circumstances of this case give rise to an *inference* that the mortgage broker failed to obtain a loan for them because of their race. The mortgage broker's explanation was that the Greens were simply unqualified to obtain the kind of loan they sought. But this explanation could only hold water if the Greens had restricted the broker's search to "A" lenders, and on that point the jury believed the Greens, who said they asked for no such restrictions. The inference of race discrimination went unrebutted, and, as stated in the broker's own papers submitted to the trial court, if the broker failed "to submit sufficient evidence to rebut the inference, plaintiffs will succeed on their claim."

Which the plaintiffs did, with the jury returning a verdict of $150,000 against the mortgage broker. We affirm.

I

This is the second appeal in this case. The first appeal arose out of what can only be described as a procedural mess. Here is a brief history:

The case started out with a single cause of action for race discrimination based on the Unruh Civil Rights Act against the mortgage broker, Rancho Santa Margarita Mortgage Company, and the developer, J. M. Peters Company. At the close of the Greens' case they requested permission to amend their complaint to add a claim for professional negligence against the mortgage broker. The trial court denied the request.

The jury then awarded the Greens $80,000 in damages against the mortgage broker on their civil rights claim, but also found, in answers to special questions, that the mortgage broker's less-than-adequate efforts were not due to or influenced by the Greens' race. The jurors also completely exonerated the developer, returning a defense verdict on its behalf.

After the judgment was entered against it, the mortgage broker requested that the judgment be set aside and a new one entered in its favor based on the contradiction between the jury's award and the fact that race was not a factor in the broker's failure to obtain a loan. The Greens then asked for a new trial if mortgage broker's request was granted. The trial court granted the mortgage company's motion to have a judgment entered in its favor, then in rapid succession vacated that judgment and granted the Greens' motion for a new trial, limited to their claim against the mortgage broker. The court did nothing to affect the judgment in favor of the developer.

The Greens were then given permission to file a new complaint which added a cause of action for professional negligence. The mortgage broker tried to take Elizabeth Green's deposition, but she did not show up. The court ordered her to appear for a deposition and, rather than have her deposition taken, the Greens agreed with the mortgage company to a retrial *without* a cause of action for professional negligence. The Greens never bothered to actually file an amended complaint.

Next the mortgage broker filed a motion to preclude a retrial on any cause of action beyond the original civil rights claim. Despite their agreement with the mortgage broker to drop their negligence claim, the Greens opposed the motion, which the trial court did not grant. Instead, the trial court ordered Elizabeth Green's deposition the next day, and said if its order was not complied with, then it would not allow the Greens to sue for professional negligence.

Elizabeth Green again did not come to the deposition, and the trial court entered an order which stopped the Greens from prosecuting a negligence claim against the mortgage company. The trial court then "reinstated" its earlier order granting judgment in favor of the mortgage company—because of the jury's finding that race had not influenced its less-than-diligent efforts to find a lender for the Greens—and the Greens appealed against both the developer and the mortgage broker.

The appeal against the developer was dismissed. The judgment in the developer's favor was never vacated, which meant that the notice of appeal eventually filed by the Greens was too late.

As to the appeal against the mortgage broker, we reversed on a procedural point. We reasoned that when the trial court granted the Greens' new trial motion, it reopened the question of whether race had influenced the mortgage broker's actions (or lack of them) and therefore the court had no power to grant a judgment in favor of the mortgage broker based on what the first jury had already found. (See *Murphy* v. *Bridge* (1919) 43 Cal.App. 87 [184 P. 497] [determination that one party was true owner of certain property in first trial was not binding in second trial where the court had granted a new trial].) We also ruled, however, that the trial court had not abused its discretion in the first trial when it refused to allow the Greens to amend their complaint to add a new claim for professional negligence. We pointed out that the Greens never availed themselves of the opportunity they had been given after the trial court granted their request for a new trial to amend their complaint. The case was returned to the trial court for a new trial on just the cause of action for race discrimination.

II

We now pick up the story where the first appeal left off. In February 1992, after the case had been returned to the trial court, the mortgage broker sought to amend its *answer* to include an affirmative defense based on its own negligence.[1] The mortgage broker's original answer left no room for negligence as an explanation for its failure to find the Greens a loan. It stated the mortgage broker had "worked diligently to get a loan for Plaintiffs," and "[o]nly" their own poor credit history and low qualifying income had

---

[1]Negligence is a defense to a race discrimination claim because the defendant may simply have bungled something rather than acted out of racial bigotry. In this case, the negligence defense meant that if the mortgage broker's failure to find a lender for the Greens was the product of sloth and inattention, at least it was equal-opportunity sloth and inattention.

prevented them from "getting the loan they desired."[2] On top of that the answer was verified—that is, an officer of the mortgage broker certified it under oath.

In light of its unequivocal original answer, the mortgage broker retained some ambivalence about its proffered amendment. It told the court that it "vehemently den[ied] that it was culpable of any wrong-doing, including negligence." It was only seeking to amend its answer "in the exercise of caution."

The Greens opposed the request to amend, and were not slow to pick up on where the procedural maneuvering had left them. Previous to the first trial, while there was still time for the Greens to amend their complaint to allege negligence, the mortgage broker kept mum. It was only after the first appeal when the Greens were foreclosed from amending to allege negligence that the mortgage broker came forward with its new explanation of why it did not find the Greens a loan. Pointing to this juxtaposition in his opposition points and authorities, the Greens' counsel wrote, "GIVE ME A BREAK!"

Which the trial court did. It denied the motion.

As related above, on retrial the jury returned a verdict in favor of the Greens for $150,000. ■ In its appeal from the ensuing judgment, the mortgage broker now argues that the trial court abused its discretion in refusing the request to amend.

We cannot hold that there was an abuse of discretion here. There is a platoon of authority to the effect that a long unexcused delay is sufficient to uphold a trial judge's decision to deny the opportunity to amend pleadings, particularly where the new amendment would interject a new issue which requires further discovery. (See *Rainer* v. *Community Memorial Hosp.* (1971) 18 Cal.App.3d 240, 258 [95 Cal.Rptr. 901], and authorities cited there.) Denial will also be upheld where the amendment "contradicts an admission in the original pleading." (See *Landis* v. *Superior Court* (1965) 232 Cal.App.2d 548, 554 [42 Cal.Rptr. 893].)

The mortgage broker here offered no excuse for its delay in seeking to amend. The only declaration supporting its request was that of an attorney authenticating the proposed amended answer.

---

[2]Here is the complete text of Rancho Santa Margarita Mortgage Company's third affirmative defense, included in its answer filed September 13, 1989:

"Even though Plaintiffs had marginal credit and low qualifying income for the loan they wanted, this answering Defendant worked diligently to get a loan for Plaintiffs. Only Plaintiffs' own poor credit history and low qualifying income prevented Plaintiffs from getting the loan they desired."

Of course, it is fairly obvious why the mortgage broker waited so long and why it articulated no excuse for its delay in seeking to amend. If the broker had asserted its own negligence prior to the first trial, it almost certainly would have lost the case on *some* theory. By waiting until after the first appeal and the subsequent stricture against allowing the Greens to amend, the case was perfectly postured for the assertion—now without cost—of professional negligence as an affirmative defense. Thus it is clear that the original "failure" to include negligence as a defense was no failure at all, but a conscious strategic decision to win the entire case by prevailing on the race discrimination claim rather than risk defeat on a negligence claim. As such, the mortgage broker had no "excuse" for not pleading the negligence defense prior to the first appeal.

The best counter to this lack of excuse is the fact that the bar against the Greens pleading a negligence cause of action (as distinct from the broker's pleading a negligence *defense*) was totally of their own doing. It was they, after all, who agreed to give up their negligence claim in return for not being deposed. One might derive from this fact a lack of prejudice to the Greens from the assertion of a negligence *defense,* and conclude that, in the absence of any prejudice, it was an abuse of discretion not to let the mortgage broker amend its pleadings. (See *Dunzweiler* v. *Superior Court* (1968) 267 Cal.App.2d 569, 576 [73 Cal.Rptr. 331] [amendments should be allowed where, among other things, there is no prejudice].)

But this line of analysis still neglects the fact that there was no attempt on the mortgage broker's part to amend until there *was* prejudice to the Greens, regardless of whether the Greens brought some of that prejudice on themselves. Further, the trial court would have been justified in concluding that not *all* the prejudice incurred by the Greens was their fault. The Greens might not have been so willing to trade their negligence action to be free of a deposition had the mortgage broker given some indication of its desire to amend.

Finally, there is no doubt that an amendment would have both contradicted the mortgage broker's previous verified pleading ("Defendant worked diligently to get a loan for Plaintiffs"—asserted under oath) and required further discovery, requiring the Greens to substantially redo their trial strategy. Given lack of any excuse for not pleading the defense earlier—the decision not to plead negligence was legal gamesmanship in its purest sense[3]—we cannot say the trial court abused its discretion in denying the request to

---

[3]*Landis* v. *Superior Court, supra,* 232 Cal.App.2d at pages 554-555, states that where the unexcused delay is "indicative of bad faith," denial has been upheld. By "gamesmanship" we do not mean to suggest "bad faith" on the mortgage broker's part; the word is used in its

amend.[4] There were too many valid considerations against allowing the amendment to say that the trial court exceeded the bounds of reason.

### III

■ A harder question is posed by the next issue raised by the mortgage broker, namely, whether the jury's verdict was supported by substantial evidence. There was no direct evidence of racial discrimination. The developer entered into a contract to sell the Greens a home, the mortgage broker agreed to undertake the task of finding the Greens a loan.[5] In this sense the Greens were treated no differently than any other prospective buyers.

Traditionally, discrimination cases have been legally analyzed as a sort of game of "hot potato." The plaintiff would first have the burden of showing a "prima facie" case of discrimination. If the plaintiff succeeded, the defendant would then have the burden of showing there was a nondiscriminatory reason for the way the defendant treated the plaintiff. If the defendant failed to carry that burden, the plaintiff won. If the defendant succeeded, the burden would then shift back to the plaintiff to show that the defendant's reason was really only a "pretext" for discrimination. The case would finally turn on whether the plaintiff succeeded in showing that the nondiscriminatory reason was such a pretext. (E.g., *McDonnell Douglas Corp.* v. *Green* (1973) 411 U.S. 792, 802 [36 L.Ed.2d 668, 677-678, 93 S.Ct. 1817]; *Clark* v. *Claremont University Center* (1992) 6 Cal.App.4th 639, 663-665 [8 Cal.Rptr.2d 151]; *Mixon* v. *Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306, 1317-1319 [237 Cal.Rptr. 884].)

In the relatively recent decision in *St. Mary's Honor Center* v. *Hicks* (1993) 509 U.S. __ [125 L.Ed.2d 407, 113 S.Ct. 2742], the United States Supreme Court identified a potential problem in this game of hot potato,

---

mathematical sense of strategy within a closed system. However, we do mean to emphasize that the original decision not to plead negligence was obviously deliberate and strategic, not a mere product of inadvertence.

[4]On page 17 of the mortgage broker's opening brief, the broker asserts that in denying the motion to amend, the trial court read our previous opinion as "directing him to re-try the case on the pleadings as framed." The broker then argues that the trial court misread our opinion. We do not address the question of whether the trial court misread our opinion because there are no record references supporting the idea that the trial court ever denied the motion based on our opinion in the first place.

[5]This case is thus different from the recently decided *Barber* v. *Rancho Mortgage & Investment Corp.* (1994) 26 Cal.App.4th 1819 [32 Cal.Rptr.2d 906], which involved a claim against a *lender* for turning down the loan application of two perfectly qualified buyers for an Federal Housing Administration loan on the ground that the buyers really did not intend to occupy the house. The instant case involves a *mortgage broker* who failed to *find* a lender for, as the jury ultimately decided, two perfectly qualified buyers.

where the last player who fails to rid itself of some "burden" loses. What happens when the defendant has a *bad* reason for acting as it did, but that bad reason is still *not* a discriminatory reason? If the trier of fact finds that the defendant's *articulated* reason for acting was false, then the plaintiff wins a discrimination suit even though the *real* reason for the defendant's actions was not discriminatory. Accordingly, the *St. Mary's Honor* court held that the mere rejection by the trier of fact of a defendant's proffered reason still did not relieve the plaintiff of the necessity of proving actual discrimination. "[N]othing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's *explanation* of its action was not believable." (509 U.S. at p. __ [125 L.Ed.2d at p. 421, 113 S.Ct. at p. 2751], italics added.)

The instant case, however, came up for retrial in the summer of 1992, about a year before the United States Supreme Court handed down the *St. Mary's Honor* decision. *The mortgage broker itself submitted a set of jury instructions reflecting the traditional hot potato rules of discrimination.* Those instructions told the jury that if the Greens made a prima case of discrimination,[6] the mortgage broker would then have "the burden of proving . . . that there was a nondiscriminatory explanation for its treatment of the plaintiffs." As the mortgage broker's points and authorities supporting the proffered jury instructions acknowledged, "If RSMMC fails to submit sufficient evidence to rebut the inference, plaintiffs will succeed on their claim."

The special verdict form given the jury reflected this basic framework. The first three questions sought to ascertain whether the plaintiffs had made out a prima facie case, the fourth asked whether the mortgage broker had carried its burden of showing a "nondiscriminatory explanation" for its "treatment of the plaintiffs." Significantly, *if* the jury found a prima facie case by answering the first three questions in the affirmative, and then found, by answering question 4 in the negative, that the broker had *not* shown a legitimate nondiscriminatory reason, then it was directed to *skip* question 5, which asked whether the "actual motivation" of the mortgage broker was race discrimination. Instead, the jury was directed to go directly to damages.

---

[6]A prima facie case would be made out, per the mortgage broker's instructions, by the Greens' proving four things:

(1) the Greens were members of a racial minority;

(2) they submitted a home loan application to the mortgage broker for which they were qualified;

(3) the mortgage broker "did not properly submit the loan application to lenders"; and

(4) at the same time, the mortgage broker "properly submitted" to lenders, the home loan applications of nonminorities "with financial conditions similar to plaintiffs" and those loans were approved.

The special verdict form thus reflected the unrebutted-inference hot potato game that could result in a verdict for race discrimination even without actual discriminatory intent. Because the judgment for race discrimination could thus be based on a lack of discriminatory intent on the part of the mortgage broker, we requested the parties' views on the application of *St. Mary's Honor* to this case. We have concluded, however, that whatever arguable change in the law has been wrought by *St. Mary's Honor* has no application here.

Any error in the verdict forms in allowing the Greens to prevail on an unrebutted prima facie case—that is, simply an inference of discrimination —was waived by the mortgage broker. The mortgage broker has not cited us to any part of the record showing that it objected to the special verdict forms, nor has it made any argument in this appeal that the special verdict forms did not truly reflect the law at the time.[7] Indeed, the idea the Greens should win if the jury disbelieved the mortgage broker's "explanation" was set forth in the firm's own brief on the subject of jury instructions.

With that in mind, we turn to the mortgage broker's contention that the jury's answer to question 3, which helped establish the Greens' prima facie case, is not supported by substantial evidence. Question 3 asked the jury whether the mortgage broker properly submitted home loan applications from nonminorities with financial qualifications similar to plaintiffs' and those loans were approved by lenders. The broker contends that there was absolutely no evidence that any nonminority applicant with similar financial qualifications applied for a loan through the broker and was approved.

A review of the whole record shows otherwise. There was evidence to support the jury's answer to question 3 in any event, even though that evidence was somewhat scattered.

First, the Greens presented the testimony of a sales director of the developer that the developer *required* buyers to obtain their loans from "designated lenders." These "designated lenders" were mortgage brokers who "would assist in securing financing or determining buyers' creditworthiness." The purpose of the requirement was to insure that the developer knew "up front" that it had a "viable buyer." If the developer was "satisfied

---

[7]And there is indeed some language in *St. Mary's Honor* which suggests it is still the law: "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." (*St. Mary's Honor Center* v. *Hicks, supra*, 509 U.S. at p. __ [125 L.Ed.2d at p. 419, 113 S.Ct. at p. 2749].)

with the job" the broker did the broker would continue to receive business from the developer and even "get more volume."[8]

Next, Elizabeth Green testified that the developer's sales director told the Greens that in order to purchase a house it was necessary to fill out an application and submit it to Rancho Santa Margarita Mortgage Company, the broker in this case. George Green testified that one of the broker's loan officers said the broker had "access to all . . . the major lenders."

The loan officer herself testified that the mortgage broker did, in fact, place loans for purchasers in the development. The Greens also presented evidence that a White couple purchased the house very shortly after their own escrow fell through. The husband of that couple testified that he was making $10,000 a month at the time (about $6,000 a month less than the Greens) and his wife was not working then. Finally, there was the stipulation that the Greens could have obtained a loan from 90 percent of the "B" lenders in California and 100 percent of "C" lenders.[9]

The testimony thus painted the picture of a mortgage broker which was regularly making loans to prospective buyers in the development—after all, the firm had a captive market. Buyers *had* to use a designated lender. The jury could also have compared the loan officer's testimony that the broker found loans for other buyers in the development with the sales director's testimony that if a broker did a good job it would receive even more business to conclude that the broker here obtained loans for a substantial percentage of the buyers in the development.

It is also a matter of common knowledge that Coto de Caza is not an all-Black community, and the loan officer testified that the mortgage broker did, in fact, obtain loans for buyers in the development. Therefore some White people were getting some loans, and it was reasonable to infer, in light of the fact that the subsequent buyers were making considerably less money than the Greens, that some of those White people were not as financially strong as the Greens. Even if there was no direct evidence that the subsequent buyers obtained their loan through the mortgage broker here,

---

[8]This last statement was contained in the sales director's deposition, which came into evidence when he testified that if the broker did a good job it would only "remain" with the developer.

[9]To be precise, the stipulation was that the Greens could produce an expert who would testify that they could have obtained a loan from 10 percent of "A" lenders, 90 percent of "B" lenders, and 100 percent of "C" lenders, while the mortgage broker could produce an expert who would testify that the Greens would not have qualified with any "A" lender. The stipulation said nothing about the mortgage broker's being able to produce an expert who would contradict the idea that the Greens would have been able to obtain a loan from a "B" or "C" lender.

it is not unreasonable to infer that other similarly situated White people were.

Given the fact that the Greens would, in fact, have gotten a loan from 90 percent of the "B" and 100 percent of the "C" lenders in California, the jury was further justified in concluding that the White people who did obtain loans were similarly situated with the Greens. "Similarly situated" could reasonably include anybody who, like the Greens, could afford a $440,000 home in Coto de Caza, even if they had to obtain a loan from a "B" or "C" lender. The jury was not required to assume that the White people who bought in the development and who got their loans through Rancho Santa Margarita Mortgage Company were *all* shoo-ins with "A" lenders.

■ We have also concluded that any error represented by a lack of evidence to support question 3 is harmless. At the worst, question 3 was simply part of the Greens' attempt to show a prima facie case of discrimination. However, they made out such a prima facie case *quite independent* of whether any evidence supported an affirmative answer to question three.

The central fact largely ignored by the mortgage broker is that it *could have found the Greens a loan.* Ninety percent of "B" lenders and 100 percent of "C" lenders would have made a loan. The Greens testified that they put no restrictions on the level of lender—they simply wanted a loan under the best terms they could get (as distinct from the best terms someone else might get). Not only did the jury reject the defense that the Greens had restricted the pool of lenders from whom the mortgage broker might have obtained a loan, but there was evidence that the mortgage broker's loan officer altered her record of the conversation to make it look like the Greens had so restricted the pool.

The alteration of the record revealed an awareness on the broker's part that it could have found the Greens a loan. That in itself indicates that any "negligence" on the broker's part was intentional—the "accidentally on purpose" sort of negligence that human beings are known to engage in when they are up to no good. If the broker could have found a loan, but did not, that suggests the broker did not *want* to. The broker merely had to go to a "C" lender to have a 100 percent chance of approval, so why didn't it?

Sloth? The mortgage broker's statement under oath in its own answer that it had "diligently" tried to get the Greens a loan was sufficient to allow the jury to disregard this explanation. Further, much of the broker's defense in the second trial consisted of showing that the broker actively worked on the file to try to obtain various documents from the Greens.

Greed? Perhaps the broker restricted its search to only those lenders that would pay it a certain level of commission? If that was the case, then it was necessary to show that the "B" and "C" lenders would have made a loan to the Greens were not as profitable to the broker as "A" lenders. But this idea was undercut by the defense that the Greens had artificially restricted the pool of potential lenders to just "A" lenders and the alteration of the record to try to document that defense.

The explanation that was given—that the Greens artificially restricted the loan search to "A" lenders—was simply rejected as untrue by the jury. Without sloth, greed and artificial restrictions, there is little else to explain the mortgage broker's treatment of the Greens *other than* racial discrimination. We are therefore satisfied that the jury's verdict does not reflect merely the outcome of an artificial game of legal hot potato, but the valid and unrebutted possibility of race discrimination.

## IV

The mortgage broker finally contends that the $150,000 damage award was overstated. Because damages for emotional distress may easily support the entire amount of the verdict, the broker's argument necessarily depends on establishing that there was insufficient evidence to support any emotional distress award.

The mortgage broker points to the George Green's testimony that he was "angry" when the broker told him it could not obtain a loan, he may have taken a Tylenol, and his wife drank "Maalox by the bottle." This, says the broker, is just not enough to prove serious emotional distress.

Perhaps so. But there was other evidence which supports an emotional distress award under the circumstances of this case.

When the Greens went to purchase their dream house, they were two nurses living in Compton. They had developed a strong fear of crime. They wanted security. Elizabeth Green testified that "the security thing was what I wanted more than anything." Coto de Caza represented that security.

Elizabeth Green put her husband through nursing school. When he graduated in 1984 the couple's income began to skyrocket. In the short space of five years the Greens had managed to accumulate an estate that included $50,000 in savings and almost $300,000 in real property by each working 70 hours weeks and receiving large amounts of overtime.

Thus when the loan broker failed to obtain a loan for the Greens, it meant that *years* of deferred gratification, hard work and savings with the aim of

finding a *secure* place to live were being frustrated. There was no legal requirement that the jury limit its consideration of emotional distress to just George Green's immediate reaction and a few bottles of Maalox. The jury could have considered the importance of the home purchase for the Greens in the context of the long hours and years of hard work that had gone into being able to make the leap from Compton to Coto de Caza. Given such evidence, the jury would have been amply justified to base the entirety of its award on emotional distress alone.

V

The judgment is affirmed.

Sonenshine, J., and Crosby, J., concurred.