Filed 10/9/14  Norton v. San Bernardino City Unif. School Dist. CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| EDWARD C. NORTON, | |
| Plaintiff and Respondent, | G049496 |
| v. | (Super. Ct. No. SCVSS115414) |
| SAN BERNARDINO CITY UNIFIED SCHOOL DISTRICT et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeals from a judgment and postjudgment orders of the Superior Court of San Bernardino County, Frank Gafkowski, Jr., Judge.  (Retired judge of the former Mun. Ct. for the Southeast Jud. Dist. of L.A., assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Judgment is affirmed in part and reversed and remanded in part. Postjudgment order denying motion for new trial is affirmed.  Postjudgment order awarding attorney fees and costs is reversed and remanded with directions.

Cummings, McClorey, Davis, Acho & Associates and Sarah L. Overton for Defendants and Appellants.

Law Offices of Granowitz, White and Weber and Bradley R. White for Plaintiff and Respondent.

* * *

INTRODUCTION

Defendants San Bernardino City Unified School District (the District) and Mel Albiso (collectively, defendants) appeal from the judgment entered after a jury found that during plaintiff Edward C. Norton's employment with the District, the District discriminated against him and Albiso harassed him because of Norton's race, in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). Defendants argue (1) the trial court erred by giving the jury several incorrect instructions and refusing to give certain requested instructions; (2) the court made erroneous evidentiary rulings; (3) insufficient evidence supported the jury's verdicts; (4) the court engaged in judicial misconduct; and (5) their motion for summary judgment was erroneously denied. Defendants also appeal from the trial court's postjudgment orders denying defendants' motion for a new trial, and awarding Norton $503,450.02 in prevailing party attorney fees on the ground the attorney fee award was excessive.

We reverse and remand in part and affirm in part. In accordance with *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203 (*Harris*) and its progeny, including an opinion from this court, and based on the evidentiary record before us, we reverse the judgment as to the District and remand for further proceedings because the jury was incorrectly and prejudicially instructed as to an element of Norton's discrimination claim. We therefore also reverse the order awarding Norton attorney fees and costs and remand with directions that the trial court reconsider those awards following resolution of the discrimination claim.

We affirm the judgment as to Albiso because defendants have failed to establish any prejudicial instructional or evidentiary errors at trial; sufficient evidence supported the jury's racial harassment verdict and damages award; the trial court did not

2

engage in misconduct; and defendants' argument the trial court erred by denying their motion for summary judgment is without merit. We also affirm the court's postjudgment order denying defendants' motion for a new trial as to Albiso.

FACTS AND PROCEDURAL BACKGROUND[1]

I.

1995 - 1999: NORTON IS HIRED BY THE DISTRICT AS THE DIRECTOR OF THE BUILDING SERVICES DEPARTMENT AND CONSISTENTLY RECEIVES POSITIVE PERFORMANCE EVALUATIONS.

In 1995, the District hired Norton as the director of the building services department, which was later renamed the maintenance and operations department (the department). The department was responsible for the upkeep, maintenance, and repair of 68 schools and eight administrative sites, and provided services ranging from cutting grass to replacing roofs.

Shortly before Norton was hired, the District had considered disbanding the department in favor of utilizing outside contractors to perform those functions because of widespread problems in the department. The department suffered from performance issues, employee drug use, and misuse of the District's property. Norton was asked to "straighten it out."

Norton was responsible for the department's 220 employees; thirteen supervisors and managers reported to him. Norton tackled the department's many problems, and, after three and a half years, there was a "cultural change" in the department, and a significant reduction in the number of issues that arose.

---

[1] As this matter is before us on appeal from a judgment in favor of Norton after a jury trial, "[i]n summarizing the facts, we view the evidence in favor of the judgment." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 693-694 (*Roby*).) We refer to the substantial trial evidence presented by defendants in defense of their claims as is relevant in the context of our analysis of specific legal issues in the Discussion section, part I.B., of this opinion.

From 1995 until 1999, Norton reported to two assistant superintendents. Norton received "outstanding evaluations, letters of commendation, plaudits, standing ovations by principals." He was told that he was "the best building services director in the history of the school district by both outside consultants as well as school district people." Norton never had a writeup for anything and he had many positive performance evaluations.

## II.

1999 - 2002: THE DISTRICT'S TOP LEADERSHIP CHANGES AS ARTURO DELGADO BECOMES SUPERINTENDENT; NORTON RAISES ISSUE OF COMPLAINTS ABOUT LATINOS RECEIVING PREFERENTIAL TREATMENT WITH REGARD TO EMPLOYMENT AND CONTRACTOR OPPORTUNITIES AT THE DISTRICT; NORTON RECEIVES A LETTER OF REPRIMAND.

In 1999, Arturo Delgado became the District's superintendent. There was a "clean sweep of all the top positions" at the District. Albiso[2] and Yolanda Ortega[3] became assistants to Delgado; Delgado, Albiso, and Ortega are Hispanic. Albiso was responsible for human resources and the department. Norton, as director of the department, began reporting directly to Albiso.

At a 1999 management team meeting, with 300 principals, vice-principals, department heads, supervisors, and managers in attendance, Delgado warned that if anyone were to speak out against him and his new administration, he would find out who they were and get rid of them. Delgado gave the same warning at more than one such meeting.

---

[2] Albiso was first employed in 1990 as an affirmative action officer. In 1994, he became director of classified personnel. In 1997, Albiso started reporting to Delgado when Albiso became the assistant superintendent of personnel. In 1999, Delgado appointed Albiso to an assistant to the superintendent position.

[3] Ortega was hired as an assistant to the superintendent in 2002.

"Things started to change with the new administration." Norton testified: "[T]he emphasis on selecting through favoritism and nepotism on employees that were not qualified took a major spike in the upward direction. Pretty much the consensus in the District was that you were preselected if you are Hispanic by the superintend[e]nt and the staff, contracts were awarded to contractors that weren't qualified; different times for four or five some contractors that weren't qualified were getting paid to be trained by other contractors which is unheard of." Norton testified, "[a]s I made acknowledgment of that or complaints all of a sudden I started to draw a big target on myself." He testified that he complained about preferential hiring of minority contractors who were unqualified during the 2000 to 2002 time period.

In 2002, Norton received "an unwarranted letter of reprimand" from Ortega and his supervisor at the time, David Bayle, regarding jokes Norton had told at a meeting, even though the same jokes had been previously condoned by upper management and Delgado himself. Norton testified, "every one of my supervisors said [the reprimand] was a total witch hunt." Bayle told Norton that the letter had been prepared for him and he had "no choice" but to initial off on it. The letter required that Norton satisfy several requirements; he fulfilled those requirements.

III.

2003: NORTON IS PLACED ON ADMINISTRATIVE LEAVE; HE FILES HIS FIRST ADMINISTRATIVE COMPLAINT FOR RACE DISCRIMINATION, HARASSMENT, AND RETALIATION WITH CALIFORNIA'S DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING; NORTON'S EMPLOYMENT IS TERMINATED.

Without any prior warning, on March 28, 2003, Ortega appeared in Norton's office and told him he was being placed on administrative leave. Norton asked Ortega why he was being placed on leave, and she said she could not tell him. She said there would be an investigation that would take about five days. The investigation did not conclude in five days. Instead of learning the subject of the investigation, Norton

5

received a letter from Ortega, stating that he was not to go to any school sites and was not to have any contact whatsoever with the District's property or personnel or his employment would be terminated.

Robert Leon, who is Latino, assumed the duties of director of the department after Norton went on leave even though Leon did not meet the qualifications for that position, such as having a degree from a four-year college. Leon had previously reported to Norton before he was placed on administrative leave; Norton had promoted Leon to assistant director and thought Leon did a good job.

After Norton was removed from his office and placed on leave, Leon instructed the District's employee, Bill Boutwell, to clean up Norton's office so that Leon could move into it. In May 2003, Boutwell was instructed by an unidentified person to shred all the papers in Norton's desk drawers and 60 to 70 steno pads that Norton had used for his work duties, but also to document instances of harassment beginning in 1999. The loss of the steno pads deprived Norton of notes that, he asserted, would have helped him when he eventually resumed his job duties. Norton asserted those notes would have also helped him to defend against the charges alleged against him by the District and would have supported his claims against defendants in this lawsuit.

In May 2003, Norton filed an administrative complaint with California's Department of Fair Employment and Housing (DFEH), alleging that the District's decision to place him on administrative leave in March constituted discrimination, harassment, and retaliation against him, based on his race (Caucasian). He requested an immediate right-to-sue letter; the DFEH provided him a right-to-sue letter on May 16.

In June 2003, Norton and his attorney met with Ortega and an attorney representing the District to go over a list of charges against Norton. Norton had not received any information about the charges before that meeting, but he rebutted all of them. In September 2003, Norton was served with formal charges. Following a *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194 (*Skelly*) hearing, at which Norton did not

6

produce any evidence in his defense,[4] and on the recommendation of Albiso who conducted the hearing, Norton's employment was terminated. Norton requested an appeal of the decision to terminate his employment.

## IV.

### 2004: HEARING ON NORTON'S ADMINISTRATIVE APPEAL; NORTON FILES A SECOND DFEH COMPLAINT AND INITIATES THE INSTANT LAWSUIT; THE DISTRICT'S PERSONNEL COMMISSION CONCLUDES NORTON'S EMPLOYMENT TERMINATION WAS NOT JUSTIFIED AND DIRECTS THAT HE BE REINSTATED AND RECEIVE BACKPAY; NORTON IS INSTRUCTED TO RETURN TO WORK.

In 2004, Albiso was promoted by Delgado to the position of assistant superintendent and responsible for "human resources classified" and the department. In April and May 2004, Norton's appeal of the decision to terminate his employment was heard.

In May 2004, Norton filed a second DFEH complaint alleging, inter alia, he was "fired" because of his race and in retaliation for having filed his first DFEH complaint. He named the District, Delgado, Ortega, and Albiso as the respondents. Pursuant to his request, the DFEH issued Norton an immediate right-to-sue letter. Also in May, Norton filed the instant lawsuit.

In a letter dated June 16, 2004, Norton's counsel learned that the personnel commission adopted a hearing officer's decision; the hearing officer found, inter alia, Norton's employment had been wrongfully terminated. Counsel was further informed that because the hearing officer had found one of the 18 alleged charges meritorious, she modified Norton's discipline to a 30-day suspension; the remaining charges were

---

[4] Norton believed he had already sufficiently refuted the charges at the meeting in June 2003 and nothing further needed to be provided. Ortega testified that when an employee does not present evidence at a *Skelly* hearing, "[w]e have no choice but to make a determination based on the facts that are before us and the investigation."

dropped.  Norton was therefore to be reinstated and receive backpay.  In June, however, he received a letter from Ortega, stating, without explanation, that he was being placed on administrative leave with pay and was to remain "on call" at home until further notice. Norton was directed not to have any contact with the District's employees or to go to the District's property.

In September, Norton filed a petition for writ of mandate in the superior court, seeking reinstatement of his position as director of the department and backpay. He also challenged the hearing officer's 30-day suspension.  In November, Norton received a letter from Ortega, informing him that he was to return to work on November 15, 2004 and report to Albiso who would give Norton instructions on his duties and responsibilities.

V.

NOVEMBER 2004 - JANUARY 2008:  NORTON RETURNS TO WORK; ALTHOUGH NORTON REGAINS HIS DIRECTOR TITLE, LEON CONTINUES TO PERFORM THAT ROLE; ALBISO INITIALLY GIVES NORTON VIRTUALLY NO WORK, THEN AFTER NORTON COMPLAINS TO A SCHOOL BOARD TRUSTEE, ALBISO GIVES NORTON AN OVERWHELMING AMOUNT OF WORK; ALBISO CAUSES NORTON TO BE PHYSICALLY ISOLATED AND OSTRACIZED.

Starting on November 15, 2004, Norton reported to Albiso and was assigned an office near Albiso's office in the administration building.  Albiso was Norton's supervisor from November 15, 2004 until January 2009.

Albiso did not assign Norton director-level duties, but menial tasks that consisted of "petty, busy work off and on."  Norton was often left with nothing to do, notwithstanding his repeated complaints that he was not given sufficient resources. Unlike the other department heads of the District, Norton had no staff or his own secretary.  From November 2004 until October 2005, he openly read 26 novels, did volunteer work, created soccer team lineups, and "did anything that [he] could do to keep from going stir crazy."

8

Although Norton's title of director of the department was restored to him, Leon continued to perform that role. Leon's office was in the department's building and the department's staff reported to Leon.

In May 2005, an organizational chart for the department was prepared by Leon, and approved by Albiso. The chart identified Leon as the acting director; the chart did not include Norton. In August 2005, Albiso prepared a visual presentation for the District's managers, which identified Leon as the acting director of the department and other leaders in the department; Norton was not included.

In August 2005, a trustee of the District's school board asked Norton how things were going with his reinstatement. Norton told her how he was being treated. He was shortly thereafter assigned a "truck load" of documents to read and evaluate with instructions to devise a plan, at a level that he thought would require a consultant and 20 people to complete. From October 2005 until February 2008, Albiso directed Norton to conduct school site inspections which involved performing custodial functions that were duplicative of work already performed by custodial staff.

In November 2005, Albiso was elected to the Colton Joint Unified School District board. During a lunch meeting with Dennis Byas, the superintendent of that district, Albiso asked Byas what his administrative team "looked like." Byas told Albiso that he had two male assistant superintendents and one female assistant superintendent. Albiso asked, "what race are they?" Byas told Albiso that they were Caucasian. Albiso told Byas, "I'd like for you to replace them with Latinos." Byas refused, stating that his team consisted of highly competent, long-term employees. Albiso then suggested that Byas create three new assistant superintendent positions and fill them with Latino candidates. Byas said there was no need to create three new positions.

In April 2006, Norton received a reprimand he thought unjustified. In June 2006, Norton received what he believed was an unfair performance evaluation which he rebutted to no avail.

9

On one occasion in 2006, Pam Stotts, who worked in the department and with whom Norton had a good working relationship, walked by Norton's office after delivering some keys to Albiso's office. Stotts and Norton made eye contact and were exchanging pleasantries when they were interrupted by Albiso's administrative assistant, Sue Wright, who told Stotts that she needed to speak with her about the keys she had just delivered. Stotts followed Wright to her office and Wright closed the door. Wright asked Stotts whether Norton had "lure[d]" her into his office. Stotts responded, "no," and explained they had just made eye contact and she had asked how he was doing. Wright told Stotts that Albiso did not want Norton talking to anyone. Stotts said she did not know that. Wright called Stotts the next morning. Stotts went to her office and Wright asked her again whether Norton had lured her into his office. Stotts responded, "no." Stotts was called later that day and told to speak with an affirmative action investigator. The investigator wrote up a statement about Stotts's interaction with Norton the previous day. Stotts said the statement did not reflect what had happened so she refused to sign it until it was revised.

VI.

JANUARY 2008 - JANUARY 2009: A PANEL OF THIS COURT ORDERED THAT A WRIT OF MANDATE ISSUE COMMANDING THE DISTRICT TO REINSTATE NORTON TO HIS FORMER POSITION, ALONG WITH ALL OF THE DUTIES AND RESPONSIBILITIES ATTENDANT TO THAT POSITION; CERTAIN DUTIES AND RESPONSIBILITIES ARE RESTORED TO NORTON, BUT NORTON DESCRIBES THE YEAR FOLLOWING OUR DECISION AS "HELL ON EARTH."

In January 2008, a panel of this court directed the trial court to issue a writ of mandate compelling the District to fully reinstate Norton to the title, salary, and duties and responsibilities of his former position as director of the department as they existed on March 28, 2003. (See *Norton v. San Bernardino City Unified School Dist.* (2008) 158 Cal.App.4th 749, 765.)[5] On February 4, 2008, Norton's former duties and

---

[5] The jury was not given a copy of either the hearing officer's decision or *Norton v. San Bernardino City Unified School Dist.*, *supra*, 158 Cal.App.4th 749.

10

responsibilities as director of the department were restored to him and he returned to the department's building; Leon became the "special projects" director under Albiso. Although the name of the department had changed, the job description for the position of director of the department had never been changed. Albiso continued to be Norton's supervisor until Albiso was promoted to the position of associate superintendent in January 2009.

Norton testified that the time period, beginning February 2008 and ending January 2009, was the worst year of his employment; he felt like he was in a prisoner of war camp. Albiso frequently threatened Norton with employment termination. Norton was set up for failure by Albiso as he was denied access to financial, contract, and other information, including the department's files, necessary to do his job. Albiso reprimanded Norton for meeting with his staff. Norton was excluded from meetings and planning sessions. The restrictions Albiso imposed on Norton had not been in place before Norton was put on administrative leave. Albiso was critical and demeaning. In July 2008, Norton received "a series of written reprimands, directives and performance expectations." Albiso requested consideration of Norton's employment termination.

Norton testified about how defendants' conduct had damaged his emotional and physical health. He had been in therapy and continued to see a therapist as of the date of trial. An expert clinical psychologist, who had provided Norton therapy since January 2008, treated Norton for work-related anxiety, stress, and depression. The expert testified that he recommended Norton continue therapy for an indefinite period of time in the future.

VII.

NORTON FILES THE THIRD AMENDED COMPLAINT (THE OPERATIVE COMPLAINT); THE TRIAL COURT DENIES DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

In April 2008, Norton filed the operative complaint, the third amended complaint, against defendants, containing claims for (1) unlawful harassment based on

11

race and/or age (over 40)[6] in violation of the FEHA; (2) retaliation for Norton having voiced concerns and protested various actions of the board of education, the superintendent, upper management, and Albiso "for hiring or promoting relatively unqualified employees or applicants for employment based on their status as members of minority racial/ethnic groups, as compared to more qualified employees or applicants who were not members of such groups, and for providing Hispanics with preferential personnel treatment in other respects, as a result of their race/ethnicity"; (3) wrongful termination of employment in violation of the FEHA because of Norton's race and national origin, and because he filed a previous complaint of harassment and retaliation with the DFEH; (4) unlawful harassment in violation of the FEHA, based on his race, color, national origin, and ancestry, and in retaliation for his previous DFEH complaints; (5) unlawful retaliation in violation of the FEHA; and (6) unlawful discrimination in violation of the FEHA.

Defendants filed a motion for summary judgment or, in the alternative, for summary adjudication. In a 44-page ruling, the trial court denied the motion for summary judgment.

VIII.

THE JURY FINDS THE DISTRICT LIABLE FOR RACIAL DISCRIMINATION AND FINDS ALBISO LIABLE FOR HARASSMENT BASED ON RACE; THE COURT DENIES DEFENDANTS' MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND FOR NEW TRIAL AND AWARDS NORTON $503,450.02 IN PREVAILING PARTY ATTORNEY FEES; DEFENDANTS APPEAL FROM THE JUDGMENT, THE ORDER DENYING THE MOTION FOR NEW TRIAL, AND THE ORDER AWARDING ATTORNEY FEES AND COSTS.

After a 39-day trial, the jury returned special verdicts finding the District liable for discrimination and Albiso liable for harassment, both based on race. The jury also returned a special verdict stating its finding that "[a]s a result of filing his complaints with the DFEH," Norton was not "subjected to unwanted harassing conduct because he is

_____
[6] Norton dropped his age-related FEHA claims before trial.

Caucasian." The jury awarded Norton damages "attributable to disparate treatment and/or harassment by the District" in the amounts of $50,000 for past noneconomic loss, including mental suffering, and $80,000 for future noneconomic loss, including mental suffering. The jury awarded Norton damages "attributable to harassment by Mel Albiso" in the amounts of $130,000 for past noneconomic loss, including mental suffering, and $100,000 for future noneconomic loss, including mental suffering. Judgment was entered on the special verdicts.

Defendants filed a motion for judgment notwithstanding the verdict (JNOV) asserting insufficient evidence supported the jury's verdicts. Defendants also filed a motion for new trial. The trial court denied both motions.

The trial court awarded Norton prevailing party attorney fees in the total amount of $503,450.02, and $31,679.08 for costs.

Defendants filed a notice of appeal, stating that they appealed from the judgment and the orders denying their JNOV motion, new trial motion, and motion for summary judgment, and the order overruling their demurrer to the third amended complaint.[7] Defendants also filed a notice of appeal from the court's order awarding attorney fees and costs.

DISCUSSION

I.

FOLLOWING *HARRIS*, *SUPRA*, 56 Cal.4th 203, AND ITS PROGENY,<br>WE REVERSE THE JUDGMENT AGAINST THE DISTRICT FOR RACIAL<br>DISCRIMINATION AND REMAND FOR FURTHER PROCEEDINGS<br>BECAUSE OF PREJUDICIAL INSTRUCTIONAL ERROR.

As to Norton's discrimination claim against the District, the jury was instructed, inter alia, with a modified version of former CACI No. 2500 which instructed as follows:

_____

[7] Defendants have not raised any issues regarding the trial court's ruling on their demurrer or the JNOV motion in their appellate briefs.

13

"Edward C. Norton claims that San Bernardino City Unified School District wrongfully discriminated against him on the basis of race.  Such discrimination is unlawful.  To establish this claim, Edward Norton must prove all of the following:

"1.  That San Bernardino City Unified School District was an employer;

"2.  That Edward C. Norton was an employee of San Bernardino City Unified School District;

"3.  That San Bernardino City Unified School District took adverse employment actions against Edward C. Norton;

"4.  *That Edward C. Norton's race was a motivating reason for the adverse employment action*;

"5.  That Edward C. Norton was harmed; and

"6.  That the adverse employment actions were a substantial factor in causing Edward C. Norton's harm."  (Italics added.)

The jury was also instructed with former CACI No. 2507 which stated, "[a] 'motivating reason' is a reason that contributed to the decision to take certain action, even though other reasons also may have contributed to the decision."

Consistent with those instructions, the jury was asked to find in its special verdict form whether Norton's race was "a motivating reason" for the District's adverse employment action.  The jury marked "[y]es" in response to that question on the special verdict form and awarded Norton a total of $130,000 in damages against the District.

A.

*Harris*, supra, *56 Cal.4th 203, and Its Progeny*

After defendants filed their appellate reply brief in this case, the California Supreme Court decided *Harris*, *supra*, 56 Cal.4th at pages 214-215, in which the plaintiff alleged her employment had been terminated because she was pregnant, in violation of the FEHA.  The Supreme Court held that former CACI No. 2500 did not properly state the law because it instructed the jury "to determine whether discrimination was 'a

14

motivating factor/reason' for [the plaintiff]'s termination." (*Harris*, *supra*, at p. 232.) The court explained, "the jury should instead determine whether discrimination was 'a substantial motivating factor/reason.'" (*Ibid*.) The Supreme Court stated: "Requiring the plaintiff to show that discrimination was a *substantial* motivating factor, rather than simply *a* motivating factor, more effectively ensures that liability will not be imposed based on evidence of mere thoughts or passing statements unrelated to the disputed employment decision. At the same time, . . . proof that discrimination was a *substantial* factor in an employment decision triggers the deterrent purpose of the FEHA and thus exposes the employer to liability, even if other factors would have led the employer to make the same decision at the time." (*Ibid*.)

In *Harris*, the jury had been instructed with former CACI No. 2500, which required the jury to determine whether discrimination was "'a motivating factor/reason'" for the plaintiff's employment termination. (*Harris*, *supra*, 56 Cal.4th at p. 232.) The Supreme Court affirmed the Court of Appeal's judgment overturning the jury's damages verdict and remanded the matter for further proceedings. (*Id.* at p. 242.)

In *Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 469-470 (*Alamo*), the appellate court held: "In accordance with *Harris*, we now hold that the trial court prejudicially erred in instructing the jury with the former versions of CACI Nos. 2430, 2500, 2505, and 2507 because the proper standard of causation in a FEHA discrimination or retaliation claim is not 'a motivating reason,' as used in the CACI instructions, but rather 'a substantial motivating' reason, as set forth in *Harris*." The court rejected the argument "that a jury in an employment discrimination case would not draw any meaningful distinction between 'a motivating reason' and 'a substantial motivating reason' in deciding whether there was unlawful discrimination [because] the Supreme Court reached a contrary conclusion in *Harris*." (*Id.* at p. 479.)

In *Mendoza v. Western Medical Center Santa Ana* (2014) 222 Cal.App.4th 1334, 1341-1342 (*Mendoza*), a panel of this court similarly held that the trial court

15

"should have instructed the jury to determine whether [the employee]'s report of sexual harassment was a substantial motivating reason for [the employee]'s discharge." The court further held, "[f]ollowing *Harris* and *Alamo*, we conclude this error was prejudicial." (*Id.* at p. 1342.) The court reversed the judgment, stating, "[v]iewing the evidence *'in the light most favorable' to defendants* [citation], there is a reasonable probability that the instructional error prejudicially affected the verdict." (*Ibid.*, italics added.)

B.

*The Trial Court Erred by Instructing the Jury with Former CACI Nos. 2500 and 2507 and That Error Was Prejudicial in Light of the Substantial Trial Evidence Showing the District Took Adverse Employment Actions Against Norton Because of His Poor Interpersonal Skills and Other Reasons Unrelated to Norton's Race.*

In light of *Harris*, *supra*, 56 Cal.4th 203, and its progeny, we must conclude the former CACI Nos. 2500 and 2507 instructions were given to the jury in error. In *Harris*, *Alamo*, *supra*, 219 Cal.App.4th 466, and *Mendoza*, *supra*, 222 Cal.App.4th 1334, the courts held such instructional error was prejudicial, reversed the judgment, and remanded the matter to the trial court for retrial. Here, in light of the substantial trial evidence produced by defendants showing that the adverse employment actions taken against Norton were for reasons unrelated to his race, we similarly must conclude the error was prejudicial.

Defendants produced evidence, at trial, showing that Norton was disciplined and counseled because of his poor interpersonal skills. On more than one occasion, he shouted and swore at union officials and members. Norton called the school employees' union representative "a piece of shit" and also told him he was "the fucking reason why the classified employees are lazy in the school district." The union president testified that in 1999, the union received a "heavy volume of calls from employees at maintenance and operations from the harassment of Mr. Norton and it got so bad that we

16

actually staged not a protest, but a gathering at the school board meeting with all the employees from maintenance and operations." Over 200 people attended the meeting.

Norton also told inappropriate jokes or made comments with racial and gender undertones. Notwithstanding the District's efforts to assist Norton in improving his interpersonal skills, he did not improve and the District continued to receive complaints about Norton from employees. The department's operations manager, Boutwell, told Norton "that the ongoing battles he was having and his people skills were going to hinder his career and could lead to serious disciplinary problems." Norton responded that he had "an exemplary record for productivity and that no one could do anything to him." He also said, "if anyone tried to fire him that he would sue them and have an ironclad case."

Evidence was admitted showing that Norton was placed on administrative leave after he had asked an employee to falsify a document—a charge that was substantiated by the hearing officer at the administrative hearing, addressing whether Norton's employment was properly terminated. After Norton was reinstated to his position, some employees threatened to quit and others expressed fear that he would retaliate against them when he returned. The District tried to avoid losing employees by placing Norton back on administrative leave following the administrative hearing and evaluate its options.

Defendants also produced evidence that Norton's replacement, Leon, did a good job as the acting director of the department. He was "fair and equitable with the employees." The union president testified that after Leon became the acting director of the department, "almost all complaints went away."

There was also evidence of Norton and Albiso's poor personal relationship. Norton testified he did not like Albiso. He referred to Delgado, Albiso, and Ortega as "the Taliban" in the journal in which he wrote during the workday. He called Albiso a

"dirty Mexican." Albiso testified that Norton's demeanor toward Albiso was arrogant, flippant, argumentative, insubordinate, and aggressive.

Even though the jury found on the special verdict for the discrimination claim that adverse employment actions taken against Norton were motivated in some part by his race, the jury had before it evidence that those actions were also motivated by several nonrace-related reasons. Consequently, on this record, the erroneous instruction only requiring that the jury find that race was "*a* motivating factor" (*Harris*, *supra*, 56 Cal.4th at p. 232) as opposed to "a *substantial* motivating factor" (*ibid.*) for taking such actions was prejudicial. Quite simply, in view of the evidence before us, we cannot say with the required degree of probability that the jury would have found racial animus was a substantial motivating factor in the discrimination of Norton. We therefore reverse the judgment as to the racial discrimination claim against the District and remand for further proceedings on that claim.

C.

*Defendants Did Not Forfeit the Right to Challenge Former CACI Nos. 2500 and 2507.*

In a supplemental letter brief, Norton argues any error in the jury instructions regarding Norton's discrimination claim was invited by defendants who are now estopped from challenging those instructions. We disagree.

*Harris*'s articulation of a heightened standard applies to this appeal because Norton's judgment is not yet final. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 23 ["Courts of Appeal routinely consider newly published case law that was not available until after entry of judgment in the trial court"].) Judicial decisions apply retroactively to cases not yet final. (*Id.* at pp. 24-25; see *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1334-1335.) We cannot fault trial counsel or the trial court for failing to anticipate the new case. (*In re Gladys R.* (1970) 1 Cal.3d 855, 861; *Guardianship of Stephen G.* (1995) 40 Cal.App.4th 1418, 1422-1423.)

18

Here, the Supreme Court's decision in *Harris*, *supra*, 56 Cal.4th 203, was not filed until February 7, 2013—over a month after defendants filed the appellants' reply brief in this appeal. Before oral argument on June 17, 2014, defendants' counsel filed a letter notifying this court she intended to cite the following cases that were filed after appellants' briefs were filed: *Harris*, *supra*, 56 Cal.4th 203; *Alamo*, *supra*, 219 Cal.App.4th 466; *Mendoza*, *supra*, 222 Cal.App.4th 1334; and *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830).

At oral argument on June 17, 2014, defendants' counsel argued that pursuant to *Harris*, *supra*, 56 Cal.4th 203, the former CACI instructions on discrimination were prejudicially erroneous. Norton's counsel conceded, at oral argument, that the former CACI Nos. 2500 and 2507 instructions that were given to the jury were erroneous under *Harris*. We invited the parties to submit supplemental letter briefs on the impact of *Harris* and its progeny on this appeal and the parties filed such briefs. Under these circumstances, defendants have not forfeited the right to challenge those instructions in this appeal, which they have done successfully, for the reasons discussed *ante*.

II.

WE AFFIRM THE JUDGMENT AS TO NORTON'S
RACIAL HARASSMENT CLAIM AGAINST ALBISO.

*Harris*, *supra*, 56 Cal.4th 203, did not affect the CACI instructions given in this case for harassment based on race. We therefore address each of defendants' arguments as they pertain to the remainder of the judgment, which consists of the awards in Norton's favor against Albiso for harassment based on race.

A.

*Instructional Error Issues*

Defendants contend the trial court erred by instructing the jury with special jury instruction No. 1 stating that Norton's employment termination by the District was

19

without just cause, special jury instruction No. 2 defining harassment, and special jury instruction No. 3 defining adverse employment action. Defendants contend the trial court further erred by failing to give the jury CACI No. 2523 on harassment (instead of special jury instruction No. 2), and CACI No. 2508 regarding Norton's failure to file a timely administrative complaint.

1.

*Special jury instruction No. 1 correctly stated that Norton's employment was terminated in 2003 without just cause; any error in giving that instruction was harmless.*

Defendants contend the trial court erred by giving special jury instruction No. 1 which stated: "Plaintiff's termination by the San Bernardino City Unified School District in September 2003 was without just cause. This determination has already been made in separate legal proceedings which are binding and final for purposes of this action. You must still determine, however, whether or not race, color, or national origin was a motivating factor in the decision to terminate Plaintiff."

The instruction accurately stated that Norton's employment termination in 2003 was without just cause pursuant to a binding and final determination in a separate legal proceeding. The instruction properly clarified, however, that even though the employment termination was without just cause, the jury was to determine in the instant case whether his employment termination had anything to do with Norton's race, color, or national origin.

Although special jury instruction No. 1 suffers from the same infirmity as former CACI No. 2500 in inaccurately referring to the element of discrimination requiring that race be a motivating factor, that error is harmless because we reverse the judgment as to the discrimination claim. Norton's harassment claim does not require any adverse employment action, much less an adverse employment action motivated by race.

20

2.

*Special jury instruction No. 2, entitled "Harassing Conduct Explained,"*
*accurately stated the law; the trial court did not err by giving that*
*instruction instead of CACI No. 2523.*

Defendants requested that the trial court give the jury CACI No. 2523 regarding the definition of harassment, which states:

"Harassing conduct may include [any of the following:]

"[a. Verbal harassment, such as obscene language, demeaning comments, slurs, [or] threats [or] [*describe other form of verbal harassment*];] [or]

"[b. Physical harassment, such as unwanted touching, assault, or physical interference with normal work or movement;] [or]

"[c. Visual harassment, such as offensive posters, objects, cartoons, or drawings;] [or]

"[d. Unwanted sexual advances;] [or]

"[e. [*Describe other form of harassment if appropriate*].]"

CACI No. 2523 is consistent with the language in former section 7287.6, subdivision (b)(1) of title 2 of the California Code of Regulations.[8]

---

[8] California Code of Regulations, title 2, former section 7287.6, subdivision (b)(1) (now recodifed at section 11019, subdivision (b)) provided in part:
"Harassment includes but is not limited to:
"(A) Verbal harassment, e.g., epithets, derogatory comments or slurs on a basis enumerated in the Act;
"(B) Physical harassment, e.g., assault, impeding or blocking movement, or any physical interference with normal work or movement, when directed at an individual on a basis enumerated in the Act;
"(C) Visual forms of harassment, e.g., derogatory posters, cartoons, or drawings on a basis enumerated in the Act; or
"(D) Sexual favors, e.g., unwanted sexual advances which condition an employment benefit upon an exchange of sexual favors."

21

The trial court refused that instruction, and instead gave the jury "Court Special Jury Instruction Number 2," entitled "Harassing Conduct Explained," which stated:

"It is conduct engaged in because of the race, color, or national origin of an employee which alters the conditions of the employment and creates an abusive working environment. It may include, but is not limited to, the following:

"(A) Verbal harassment, such as obscene language, demeaning comments, use of intimidation, threats, innuendos, epithets, derogatory comments or slurs.

"(B) Physical harassment, such as assault, impeding or blocking movement, or any physical interference with normal work or movement.

"(C) Visual harassment due to and/or because of the race, color, or national origin of an employee such as derogatory posters, cartoons, or drawings;

"(D) *Harassment in the form of nitpicking, badgering, unfair and undeserved criticisms, reprimands, discipline, monitoring, and/or hostility*." (Italics added.)

Defendants contend special jury instruction No. 2 was given in error because harassment "is not the same as discrimination and does not refer to actions taken with regard to personnel management and work related decisions." Defendants further contend, "the performance reviews, reprimands, discipline, work assignments and criticism are business related and cannot form the basis for actionable harassment." In light of the California Supreme Court precedent, discussed *post*, defendants' argument is without merit.

In *Reno v. Baird* (1998) 18 Cal.4th 640, 645-647, the California Supreme Court held: "'[H]arassment consists of a type of conduct not necessary for performance of a supervisory job. Instead, harassment consists of conduct outside the scope of necessary job performance, conduct presumably engaged in for personal gratification, because of meanness or bigotry, or for other personal motives. Harassment is not

22

conduct of a type necessary for management of the employer's business or performance of the supervisory employee's job. [Citations.] [¶] . . . [¶] 'We conclude, therefore, that the Legislature intended that commonly necessary personnel management actions such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or nonassignment of supervisory functions, deciding who will and who will not attend meetings, deciding who will be laid off, and the like, do not come within the meaning of harassment. These are actions of a type necessary to carry out the duties of business and personnel management. These actions may retrospectively be found discriminatory if based on improper motives, but in that event the remedies provided by the FEHA are those for discrimination, not harassment. Harassment, by contrast, consists of actions outside the scope of job duties which are not of a type necessary to business and personnel management. This significant distinction underlies the differential treatment of harassment and discrimination in the FEHA.'"

In *Roby*, *supra*, 47 Cal.4th at page 707, however, the California Supreme Court clarified: "[W]e can discern no reason why an employee who is the victim of discrimination based on some official action of the employer cannot also be the victim of harassment by a supervisor for abusive messages that create a hostile working environment, and under the FEHA the employee would have two separate claims of injury." The Supreme Court explained: "Our decision in *Miller*[ *v. Department of Corrections* (2005)] 36 Cal.4th [446,] 460-466, further clarifies the FEHA's distinction between discrimination and harassment. Although discrimination and harassment are separate wrongs, they are sometimes closely interrelated, and even overlapping, particularly with regard to proof. In *Miller*, we considered whether evidence of widespread sexual favoritism in the workplace could constitute sexual harassment against the nonfavored employees. We concluded that it could, provided that the favoritism was so severe or pervasive as to alter the working conditions. [Citation.] Significantly, the

23

favoritism at issue in *Miller* took the form of official employment actions, including promotions and favorable job assignments given to female employees involved in sexual relationships with a particular male supervisor. [Citation.] The *Miller* plaintiffs, however, were not subject to any demands for sexual favors. [Citation.] In concluding that the plaintiffs had nevertheless stated a prima facie case of harassment in violation of the FEHA, we stated that widespread sexual favoritism could convey a 'demeaning message . . . to female employees that they are viewed by management as "sexual playthings" or that the way required for women to get ahead in the workplace is to engage in sexual conduct with their supervisors or the management.' [Citations.] This demeaning message, we held, could give rise to an actionable hostile work environment. [Citation.]" (*Id.* at pp. 707-708.)

In *Roby*, *supra*, 47 Cal.4th at page 708, the Supreme Court further explained: "Thus, in *Miller* the immediate source of the plaintiffs' alleged injuries was the offensive sex-biased *message* that the supervisor conveyed, not a demotion or an unfavorable job assignment, and therefore the plaintiffs' cause of action was for *harassment*, not for discrimination. Nevertheless, *official employment actions constituted the evidentiary basis of the harassment cause of action, because the supervisor used those official actions as his means of conveying his offensive message*. Our decision in *Miller* is wholly consistent with *Reno* [*v. Baird*], *supra*, 18 Cal.4th at pages 645-647, because it confirms that harassment is generally concerned with the *message* conveyed to an employee, and therefore with the social environment of the workplace, whereas discrimination is concerned with explicit changes in the terms or conditions of employment. *Miller*, however, makes clear that *in some cases the hostile message that constitutes the harassment is conveyed through official employment actions, and therefore evidence that would otherwise be associated with a discrimination claim can form the basis of a harassment claim*. Moreover, in analyzing the sufficiency of evidence in support of a harassment claim, there is no basis for excluding evidence of biased

24

personnel management actions so long as that evidence is relevant to prove the communication of a hostile message."  (Some italics added.)

In *Roby*, *supra*, 47 Cal.4th at page 710, the Supreme Court concluded sufficient evident supported the jury's harassment verdict because the evidence showed not only the supervisor's rude comments and behavior, but also her shunning of the plaintiff during weekly staff meetings, belittling her job, and reprimanding her in front of coworkers.

Under *Roby*, *supra*, 47 Cal.4th 686, harassing conduct can take the form of not only name calling and physical intimidation, but can also be in the form of official employment actions by a supervisor who, for an illegal reason, nitpicks, badgers, gives unfair criticism, reprimands, disciplines, or monitors, or otherwise displays hostility in the workplace.   Here, the trial court therefore did not err by instructing the jury with special jury instruction No. 2.


3.

*Special jury instruction No. 3 entitled*
*"Adverse Employment/Personnel Action Defined"*

Defendants contend the trial court erred by instructing the jury on the definition of the term "adverse employment action" with special jury instruction No. 3, which stated:  "An adverse employment action/personnel action is an action which materially affects the terms, conditions, or privileges of one's employment.  This includes not only specific employment decisions, but the entire spectrum of employment actions that are reasonably likely to adversely and materially impact an employee or his opportunities for advancement in his career.  [¶] Adverse employment actions include not only specific things such as termination of employment, demotions, or reduction in pay, but include a situation where an employee has his material responsibilities significantly diminished."

25

We need not decide whether special jury instruction No. 3 was given in error because the phrase "adverse employment actions" that is defined in that instruction applies to the elements of a discrimination claim. We have reversed the judgment as to the discrimination claim. The jury instructions on harassment do not use the phrase "adverse employment actions" and, thus, any error in giving that instruction was harmless.

Defendants argue, "[t]he instant instruction was misleading because it had no context and was confusing standing alone. The CACI 2500 instruction, in which a party can specify the adverse employment action, is balanced because it has all of the elements of a cause of action for discrimination. When this particular element of the cause of action is singled out without having the context of discrimination on the protected basis[,] it gives the false impression that defendants can be found liable simply if there is an adverse action taken against plaintiff. Therefore, the court erred in giving this special instruction to the detriment of the defense."

But, special jury instruction No. 3 simply offered a definition for the phrase "adverse employment action" as that phrase appeared in former CACI No. 2500. Nothing in the language of special jury instruction No. 3, or in any other instruction given at trial, suggested that defendants could be liable for any adverse employment action regardless whether it was motivated by race.

4.

*CACI No. 2508*

Defendants contend the trial court erred by denying their request that the jury be instructed with a modified version of CACI No. 2508, as follows:

"San Bernardino City Unified School District and/or Mel Albiso contend that Edward C. Norton's lawsuit may not proceed because Edward Norton did not timely file a complaint with the Department of Fair Employment and Housing. A complaint is

26

timely if it was filed within one year of the date on which San Bernardino City Unified School District's alleged unlawful practice occurred.

"San Bernardino City Unified School District's and/or Mel Albiso's alleged unlawful practice is considered as continuing to occur as long as all of the following three conditions continue to exist:

"1.  Conduct occurring within a year of the date on which Edward C. Norton filed his complaint with the department was similar or related to the conduct that occurred earlier;

"2.  The conduct was reasonably frequent; and

"3.  The conduct had not yet become permanent.

"'Permanent' in this context means that the conduct has stopped, Edward C. Norton has resigned, or San Bernardino City Unified School District's and/or Mel Albiso's statements and actions would make it clear to a reasonable employee that any further efforts to resolve the issue internally would be futile.

"The burden is on Edward C. Norton to prove that the complaint was filed on time with the department."

The trial court did not err by refusing to give the jury the modified version of CACI No. 2508.  The trial evidence showed Norton had more than once filed administrative complaints with the DFEH for discrimination, harassment and/or retaliation in violation of the FEHA.  Norton's first administrative complaint was filed in May 2003, and his second administrative complaint was filed in May 2004.  Not only did the conduct that Norton alleged was discriminatory and harassing based on race, begin in 1999 and continue until at least 2008, if anything, it increased with frequency and severity.  On this record, no reasonable jury could have found that Norton's lawsuit could not proceed because he failed to timely file an administrative complaint with the DFEH.

27

B.

*Motions in Limine*

Defendants contend the trial court erred by denying three of their motions in limine. We review the court's evidentiary rulings, *post*, for abuse of discretion. (*Hernandez v. Paicius* (2003) 109 Cal.App.4th 452, 456.)

1.

*The trial court did not abuse its discretion by limiting the evidence regarding the District's race-neutral reasons for terminating Norton's employment.*

At the pretrial hearings dealing with the parties' motions in limine, the trial court stated that it would exclude evidence of the details of the administrative hearing held as to Norton's appeal from defendants' decision to terminate his employment. The court further stated, however, defendants would be permitted to introduce evidence in "conclusionary terms" that they had received many complaints about Norton's employee relations and decided to terminate his employment because they had had enough. The court stated evidence would be permitted showing the hearing officer found that none of the charges was substantiated except one. The court explained it did not want a trial within a trial. Defendants' counsel asked the court if defendants may refer to one of the charges that involved the falsification of a document and the court said, "[y]es," but explained that further details would not be permitted.

Defendants argue the trial court's evidentiary ruling was in error as they should have been allowed to present evidence of race-neutral, nonretaliatory reasons for their decision to terminate Norton's employment. But the court permitted evidence that the employment termination decision was based on nonrace-related grounds; defendants were only precluded from going into detail about the various charges that were made

28

against Norton and consequently triggering a new trial on whether those grounds justified terminating Norton's employment.

In any event, defendants do not explain how the evidentiary ruling was prejudicial as to the harassment claim against Albiso. Defendants were permitted to, and did, introduce evidence showing their race-neutral reasons for deciding to terminate Norton's employment. Testimony was permitted that at the time Norton was placed on leave in March 2003, his then supervisor (not Albiso) recommended his employment termination because Norton had failed to treat staff and others with dignity, respect, and sensitivity; used profanity; used his authority to embarrass subordinates; failed to follow the chain of command; and falsified a document.

The jury was instructed, as discussed *ante*, with special jury instruction No. 1 that although the decision to terminate Norton's employment was not supported by just cause, the jury was to decide whether that decision was in any way motivated by Norton's race. The jury was thus instructed the jury should not assume that decision was racially motivated simply because defendants' decision to terminate Norton's employment was not justified.

2.

*The trial court did not err by admitting evidence that the District had hired unqualified contractors.*

Defendants argue the trial court erred by denying their motion in limine to preclude Norton from presenting evidence as to whether the District hired unqualified contractors. Defendants argue that such evidence should have been excluded under Evidence Code section 352 and because it "was not directly relevant to Norton's FEHA causes of action and any evidence of unqualified contractors would only serve to confuse the issues and mislead the jury."

29

The trial court did not abuse its discretion by concluding evidence that defendants had hired unqualified Latino contractors in place of qualified non-Latino contractors would be highly probative of Norton's discrimination claim based on disparate treatment. Such evidence would also be relevant to show racial animus. Defendants do not explain how that evidence would have confused or misled the jury, or resulted in prejudice to defendants, so as to substantially outweigh its probative value.

Aside from Norton's testimony stating his bare conclusion on the subject, Norton did not introduce any such evidence at trial. The absence of evidence showing the District hired unqualified contractors does not show the trial court abused its discretion by denying the motion in limine.

### 3.

*The trial court did not abuse its discretion by denying defendants' motion in limine seeking to exclude evidence that Norton's steno pads had been shredded.*

Defendants contend the trial court erred by denying their motion in limine, brought under Evidence Code section 352, which sought to exclude evidence that Norton's steno pads in his office had been shredded after Norton was suddenly placed on administrative leave in March 2003. At a minimum, the evidence was probative as reflecting an instance of harassing conduct against Norton—the destruction of 60 to 70 steno pads containing work notes, weeks after he was suddenly placed on administrative leave without explanation. Evidence was presented that the employee who shredded the steno pads asked another employee to serve as his witness as to what he was doing. The probative value of that evidence was not substantially outweighed by its prejudicial impact. Even if the admission of that evidence constituted an abuse of discretion, in light of the full record, it is harmless under any standard.

30

## C.

### *Substantial Evidence Supported the Jury's Special Verdict on Harassment.*

Defendants contend there is insufficient evidence in the record to support the jury's special verdict that Albiso harassed Norton because of his race. For the reasons we will explain, substantial evidence supported the jury's finding.

### 1.

### *Standard of review and governing legal principles under the FEHA*

"'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*' [Citation.] The substantial evidence standard of review is applicable to appeals from both jury and nonjury trials. [Citation.]" (*Jameson v. Five Feet Restaurant, Inc.* (2003) 107 Cal.App.4th 138, 143.)

The FEHA, at Government Code section 12940, subdivision (j)(1), prohibits harassment based on, inter alia, race. Unlike discrimination, which refers to bias in the exercise of an employer's official actions, harassment "refers to bias that is expressed or communicated through interpersonal relations in the workplace." (*Roby*, *supra*, 47 Cal.4th at p. 707.) Even though FEHA discrimination and harassment claims are distinct causes of action, "nothing prevents a plaintiff from proving these two violations with the same (or overlapping) evidentiary presentations." (*Id.* at p. 709.)

31

2.

*Substantial evidence supported the jury's finding that*
*Albiso harassed Norton based on his race.*

In addition to receiving special jury instruction No. 2 explaining harassing conduct, discussed *ante*, the jury was instructed on the elements of Norton's racial harassment claim against Albiso with a modified version of former CACI No. 2522A, as follows:

"Edward C. Norton claims that Mel Albiso subjected him to harassment based on his race, causing a hostile or abusive work environment. To establish this claim, Edward C. Norton must prove all of the following:

"1. That Edward C. Norton was an employee of San Bernardino City Unified School District;

"2. That Edward C. Norton was subjected to unwanted harassing conduct because he is Caucasian;[9]

"3. That the harassing conduct was severe or pervasive;

"4. That a reasonable Caucasian in Edward C. Norton's circumstances would have considered the work environment to be hostile or abusive;

"5. That Edward C. Norton considered the work environment to be hostile or abusive[;]

_____

[9] *Harris*, *supra*, 56 Cal.4th 203, does not affect former CACI No. 2522A given to the jury on the elements of harassment in violation of the FEHA. As set forth in that instruction, the applicable causation standard for harassment in violation of the FEHA is harassing conduct because of race, unlike the causation standard for discrimination in violation of the FEHA which, pursuant to *Harris*, is whether race was a substantial motivating factor for taking adverse employment action. Defendants argue, as discussed *ante*, the jury was improperly instructed as to the definition of harassment; they do not argue the jury was erroneously instructed as to the elements of a harassment claim pursuant to former CACI No. 2522A.

32

"6. That Mel Albiso participated in, assisted with and/or encouraged the harassing conduct;

"7. That Edward C. Norton was harmed; and

"8. That the conduct of Mel Albiso was a substantial factor in causing Edward Norton's harm."

Defendants argue substantial evidence did not support the jury's verdict on racial harassment by Albiso because insufficient evidence showed Albiso subjected Norton to "racially harassing conduct [that] unreasonably interfered with his work performance by creating an intimidating, hostile or offensive work environment."

We begin our analysis by noting the record contains numerous examples of Albiso subjecting Norton to harassing conduct that would support Norton's harassment claim if he also proved the harassment was based on race. Evidence showed Albiso harassed Norton by, inter alia, (1) recommending his employment termination; (2) refusing to reinstate Norton to his former duties and responsibilities as director of the department; (3) isolating Norton from the department; (4) assigning him menial tasks that duplicated other employees' efforts; (5) forbidding Norton from speaking with coworkers and coworkers from speaking with Norton; (6) excluding Norton from the department's organizational chart and presentation; (7) refusing to allow Norton to attend staff meetings; (8) issuing multiple disciplinary notices and threats to terminate Norton's employment; and (9) denying Norton the same resources and access to information as other department heads, making it extremely difficult, if not impossible, to do his job. The evidence showed that Albiso's harassing acts unreasonably interfered with Norton's work performance and created an intimidating, hostile, or offensive work environment.

Defendants do not argue that substantial evidence failed to support the finding Albiso engaged in the above described conduct. Instead, as they argued in challenging special jury instruction No. 2 explaining harassment, they argue such harassing conduct does not constitute harassment within the meaning of the FEHA.

33

Defendants point out the absence of evidence that Albiso ever subjected Norton to racially derogatory verbal, physical, or visual forms of harassment, such as racial epithets or slurs.

But, as discussed *ante*, the California Supreme Court in *Roby*, *supra*, 47 Cal.4th at page 707, clarified that official employment actions can provide an evidentiary basis for a harassment claim if those actions are the means of conveying the offensive message in violation of the FEHA. The Supreme Court explained: "This occurs when the actions establish a widespread pattern of bias. [Citation.] Here, some actions that [the supervisor] took with respect to [the plaintiff] are best characterized as official employment actions rather than hostile social interactions in the workplace, but they may have contributed to the hostile message that [the supervisor] was expressing to [the plaintiff] in other, more explicit ways. These would include [the supervisor]'s shunning of [the plaintiff] during staff meetings, [the supervisor]'s belittling of [the plaintiff]'s job, and [the supervisor]'s reprimands of [the plaintiff] in front of [the plaintiff]'s coworkers. Moreover, acts of discrimination can provide evidentiary support for a harassment claim by establishing discriminatory animus on the part of the manager responsible for the discrimination, thereby permitting the inference that rude comments or behavior by that same manager were similarly motivated by discriminatory animus." (*Roby*, *supra*, at p. 709.)

Thus, the evidence of Albiso's acts of harassment would be sufficient to support Norton's claim if substantial evidence also showed Albiso engaged in that conduct as a means of conveying a racially offensive message in violation of the FEHA. Although the record does not contain extensive evidence of Albiso's racial animus against Norton, applying, as we must, the governing substantial evidence standard of review, we conclude there is sufficient evidence to support that finding.

Specifically, the record contains the following testimony of Byas, who served as the superintendent of Colton Joint Unified School District from 1999 until

34

2007.  After Albiso was elected to the Colton Joint Unified School District board, he met with Byas for lunch.  During that lunch, Albiso asked Byas what his "administrative team look[ed] like."  Byas said it was comprised of one female and two males who each serve as an assistant superintendent.  Albiso asked, "what race are they?"  Byas responded by saying they are white.  Byas testified that Albiso said, "I'd like for you to replace them with Latinos."

Byas, who is African-American, testified he was a little offended and told Albiso, "that is not going to happen."  Byas also testified he had said, "[l]et's make sure you understand how we do it.  These people have earned these positions.  If you are going to work in this district I hire only the best.  The only way I know how to move students forward is you hire the best people and put them in the key positions, doesn't matter what they look like."  Byas was very satisfied with his three assistant superintendents.  He described them as long-term, extremely competent, and good people.

Albiso responded to Byas's comments by saying, "well, what about if we create three additional assistant superintendent positions" and "back fill those with Latinos."  Byas told Albiso he did not need or want to do that and he would not do that.  Albiso asked, "well, what about if we look for highly qualified Latinos for positions and everything, can we work together on those things?"  Byas said, "definitely, we always do.  If you are the best person for the position when we interview, you get that position."  Albiso told Byas that placing Latinos in high-ranking positions within the Colton Joint Unified School District was part of the political platform upon which he had run for his school board position.

The timing of Albiso's comments in 2005 coincided with the timing of some of Albiso's harassing conduct toward Norton.  The jury could have reasonably inferred the sentiment Albiso expressed to Byas that he desired to replace current non-Latino employees with Latinos applied to Norton.  Evidence showed that when

35

Norton was placed on leave in March 2003, based on 18 charges that were not found true, except one, his position was filled by Leon, a Latino employee who had previously reported to Norton. Although Norton's director position required a four-year college degree, Leon did not have a four-year degree in 2003; he did receive one in May 2006.

It was reasonable for the jury to find that Albiso harassed Norton because he was a Caucasian in a high, director-level position that Albiso wanted filled with a Latino (Leon). The evidence supported the reasonable inference Albiso tried to realize his goal by directly terminating Norton's employment, and, when that did not work, marginalizing Norton at work and otherwise making his life miserable to drive him out. By marginalizing Norton, even though he retained his director title, Albiso orchestrated Leon's performance of Norton's director-level duties and responsibilities, whereby Leon enjoyed the commensurate experience and influence that would come from filling such a role at the District. Substantial evidence, therefore, supported the jury's finding that Albiso subjected Norton to harassment based on his race.

We reject Norton's argument Albiso's racial animus was further supported by evidence showing that Albiso had frequently—and often publicly—expressed his frustration with ongoing employment discrimination against Latinos and the lack of representation of Latinos by Latinos on school boards. Evidence of Albiso's commitment to end discrimination, to promote qualified Latinos, and to encourage students to overcome disadvantages does not reflect conduct that runs afoul of the FEHA.

D.

*The Record Does Not Support Defendants' Argument*
*the Trial Court Engaged in Judicial Misconduct.*

Defendants contend the trial court engaged in judicial misconduct. They contend the court demonstrated bias against defendants and their counsel, erred in making certain evidentiary rulings, and inappropriately interjected comments during the

36

trial proceedings. We have reviewed the record and have found no instance—individually or cumulatively—of error.

Our review of the record shows defendants did not object to many of the alleged instances of judicial conduct. As a general rule, a claim of judicial misconduct is not preserved for appellate review if no objections were made on that ground at trial. (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237; see *Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 103 ["The rule is well settled that when . . . a party or his counsel becomes aware of facts constituting misconduct or irregularity in the proceedings . . . , he must promptly bring such matters to the attention of the court, if he desires to object to it, or he will be deemed to have waived the point."].) Nothing in the record supports defendants' argument that asserting objections would have been futile.

Defendants fail to show the trial court harbored any bias against defendants or their counsel. Defendants' references to the court's comments upon which they base their argument are taken out of context. We have already addressed and rejected, *ante*, defendants' contentions of evidentiary error, which they also cite as a basis for their judicial misconduct argument. The trial court's questions and comments on the evidence during trial were brief and few. The jury was given CACI No. 5016, and thus expressly instructed on the trial court's comments during trial, as follows: "In this case, I have exercised my right to comment on the evidence. However, you the jury are the exclusive judges of all questions of fact and of the credibility of the witnesses. You are free to completely ignore my comments on the evidence and to reach whatever verdict you believe to be correct, even if it is contrary to any or all of those comments."

Defendants argue the trial court improperly revealed to the jury that defendants had insurance in this case. Our reading of the record does not show the trial court informed the jury defendants had insurance, much less the terms of coverage. Few jurors would be surprised a school district would have some form of insurance that might cover personnel issues. In any event, the jury was instructed with CACI No. 5001, as

37

follows: "You must not consider whether any of the parties in this case has insurance. The presence or absence of insurance is totally irrelevant. You must decide this case based only on the law and the evidence." We presume the jurors followed the given instructions.

E.

*We Do Not Review the Trial Court's Denial of Defendants'*
*Motion for Summary Judgment in This Appeal.*

Defendants contend their motion for summary judgment or summary adjudication should have been granted. Although the briefing and evidence submitted in connection with the motion for summary judgment comprised over 1,000 pages in the clerk's transcript, including the trial court's detailed 44-page ruling, defendants devote two pages in each of their appellate briefs to this issue. In neither appellate brief, do defendants refer or cite to the trial court's ruling.

Even assuming defendants have not forfeited the right to challenge the trial court's denial of their summary judgment motion, "there is a real question whether [they] can even make the argument here, with some authority, including *Sierra Craft, Inc. v. Magnum Enterprises, Inc.* (1998) 64 Cal.App.4th 1252 . . . , holding [they] cannot. The order there was an order denying summary judgment, and the court held that '[Code of Civil Procedure s]ection 904.1 specifies those orders and judgments of the superior court from which an appeal may be taken. An order denying summary judgment is not one of these. Section 437c, subdivision [(m)(1)] specifies that the judgment resulting from the granting of a motion for summary judgment is appealable, as is any other judgment. However, the same subdivision provides that the denial of such a motion may only be reviewed by way of a petition for extraordinary writ.'" (*Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1010.) The appellate court in *Transport Ins. Co. v. TIG Ins. Co.* stated: "The leading practical treatise states the rule this way: 'An order

denying summary judgment or granting or denying summary adjudication is reviewable only by a petition for writ of mandamus. [CCP § 437c(m); [citations]] [¶] There is generally no basis for appeal after trial; erroneous denial of summary judgment is generally harmless error after a full trial covering the same issues. [Citation.].' (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2011) ¶ 10:385, p. 10-149 (rev. # 1, 2011).)" (*Id.* at pp. 1010-1011.)

The appellate court in *Transport Ins. Co. v. TIG Ins. Co.* held the "argument also runs afoul of the general rule that denial of their motions may not be challenged here because the parties litigated the same issues at trial. (See *California Housing Finance Agency v. Hanover/California Management & Accounting Center, Inc.* (2007) 148 Cal.App.4th 682, 688 . . . ; *Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833 . . . .) The reason is usually explained this way: '"A decision based on less evidence (i.e., the evidence presented on the summary judgment motion) should not prevail over a decision based on more evidence (i.e., the evidence presented at trial)."' (*Gackstetter v. Frawley* [(2006)] 135 Cal.App.4th [1257,] 1269, quoting Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs [(The Rutter Group 2011)] ¶ 8:168.10, p. 8-132.2 (rev. # 1, 2011).)" (*Transport Ins. Co. v. TIG Ins. Co.*, *supra*, 202 Cal.App.4th at p. 1011.)

In light of the foregoing, defendants' argument the trial court erred in denying their motion for summary judgment after losing at trial is not viable.


III.

THE TRIAL COURT DID NOT ERR BY DENYING DEFENDANTS' NEW TRIAL MOTION.

An order denying a motion for a new trial is not directly appealable but is reviewable on appeal from the underlying judgment. (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18.) In reviewing an order denying a motion for a new trial, we "'must fulfill our obligation of reviewing the entire

39

record, including the evidence, so as to make an independent determination as to whether the error was prejudicial. [Citations.]' [Citation.]" (*Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 46-47.) This differs from our review of an order granting a motion for a new trial, which we review for abuse of discretion. (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412; *Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 187, 194.)

Defendants argue their motion for a new trial should have been granted because (1) there was an irregularity in the proceedings due to the judicial misconduct, including erroneous evidentiary rulings; (2) insufficient evidence supported the verdicts; and (3) the damages awarded by the jury were excessive. For all of the reasons we have discussed *ante*, the trial court did not engage in misconduct or abuse its discretion in making evidentiary rulings, and sufficient evidence supported the jury's finding that Albiso harassed Norton because of his race.

Sufficient evidence also supported the jury's past and future noneconomic damages award against Albiso for racial harassment. Norton testified about the mental and physical problems he has experienced as a result of Albiso's harassment. Defendants argue that the award of future noneconomic damages was without evidentiary support in light of the fact Albiso is no longer Norton's supervisor and had not been for years. But, Norton's therapist testified, in his capacity both as a percipient and expert witness, that Norton will require therapy for an indefinite period of time to help him resolve his mental, emotional, and physical problems that were caused by Albiso's treatment of him. That testimony, in combination with Norton's testimony, constituted sufficient evidence to support the jury's award for future noneconomic damages.

The trial court did not err by denying defendants' motion for a new trial.

40

IV.

BECAUSE WE REVERSE THE JUDGMENT AS TO THE DISCRIMINATION CLAIM
AND REMAND FOR FURTHER PROCEEDINGS, WE REVERSE THE ORDER
AWARDING NORTON PREVAILING PARTY ATTORNEY FEES AND COSTS.

Defendants appeal from the trial court's postjudgment order awarding Norton prevailing party attorney fees and costs on the ground the attorney fee award was excessive. The trial court awarded Norton, as the prevailing party, total amounts of $503,450.02 in attorney fees and $31,679.08 in costs, against defendants after the jury found the District liable on Norton's discrimination claim and Albiso liable on Norton's harassment claim. Although we reverse the judgment only as to the discrimination claim against the District and remand for further proceedings, we reverse the entire attorney fee and cost awards. (See *Allen v. Smith* (2002) 94 Cal.App.4th 1270, 1284 [order awarding attorney fees and costs falls with reversal of judgment on which it is based]; *Barber v. Rancho Mortgage & Investment Corp.* (1994) 26 Cal.App.4th 1819, 1843 [reversed attorney fee award after appellate court reversed part of judgment with directions to reconsider such award, and any allocation thereof which may be appropriate, upon conclusion of retrial].)

On this record, we cannot say with any reasonable certainty that the trial court would have awarded the same amounts of attorney fees and costs without Norton prevailing against the District on the discrimination claim. On remand, should the discrimination claim against the District be retried, the court shall thereafter reconsider the amounts of the attorney fee and cost awards depending on the outcome of the retrial.

DISPOSITION

The judgment against the District is reversed and remanded for further proceedings. The judgment against Albiso is affirmed. The order awarding Norton

41

$503,450.02 in attorney fees and $31,679.08 in costs is reversed. The trial court shall reconsider the attorney fee and cost awards following further proceedings as to the discrimination claim against the District. The order denying the motion for a new trial is affirmed. In the interests of justice, no party is awarded costs on appeal.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.